AMERICAN INTERNATIONAL GROUP, INC.

v.

AMERICAN INTERNATIONAL AIRWAYS, INC. and Connie Kalitta Services, Inc.

Civ. A. No. 88–8242.

United States District Court, E.D. Pennsylvania.

Aug. 25, 1989.

---

13. Only Gaines, McNeil and Pickard submitted any proposed jury instructions.

Gary H. Levin, Philip S. Johnson, Philadelphia, Pa., Joel Miller, New York City, for plaintiff.

Robert K. Morse, Washington, D.C., Christopher B. Lee, Philadelphia, Pa., Robert K. Morse, Andrew B. Sacks, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

WALDMAN, District Judge.

## INTRODUCTION

Plaintiff, American International Group, Incorporated ("AIG"), seeks a preliminary injunction against defendants, American International Airways, Incorporated ("Airways") and Connie Kalitta Services, Incorporated ("CKS"), to prevent them from using the name "American International" in providing commercial aviation transportation services. By stipulation, the defendants agreed not to use the name "American International" prior to August 22, 1989, and plaintiff agreed not to seek a temporary restraining order against defendants' alleged infringement of its mark.

The parties have conducted substantial discovery. The record before the Court consists of excerpts from and transcripts of several depositions, affidavits of persons who, with one exception, were subject to an opportunity for cross-examination regarding the contents during the discovery period, and a number of marked exhibits.[1] An opportunity for hearing and oral argument was provided on August 3, 1989, at which counsel for all parties agreed to proceed on the basis of the evidence adduced through discovery and the argument of counsel. Based on this record, the Court makes the

following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Background and History

1. AIG is a New York based holding company which provides insurance, underwriting, real estate investment and other sophisticated financial services to corporations through over 150 subsidiaries in over 100 countries.

2. AIG promotes itself as the largest American international insurance conglomerate, and has a present net worth of approximately thirty-seven billion dollars with 1988 gross revenues of over thirteen billion dollars.

3. Airways is a Delaware corporation authorized, since November 18, 1981, by the Civil Aeronautics Board (CAB) to provide interstate and foreign charter air transportation services under the name "American International Airlines, Inc."

4. Airways originally provided charter passenger service between Philadelphia and Atlantic City, and after October, 1983, also provided scheduled air passenger services between Philadelphia and ten other cities in the Northeast, Midwest, and Florida.

5. CKS is a Michigan based company that provides domestic and international charter airline cargo transportation services.

6. On July 19, 1984, Airways filed a bankruptcy petition for protection from its creditors under Chapter 11, 11 U.S.C. § 1101 *et seq.*

7. Airways has not provided aviation transportation services since September 17, 1984.

8. The trustee in bankruptcy was unable to sell Airways as a complete functioning entity; consequently, many assets were sold piecemeal, while others were repossessed or foreclosed upon.

---

1. The exception is the affidavit of plaintiff's General Counsel, Wayland Mead, and defense counsel on the record declined an opportunity to call him as of cross-examination at the time of the hearing.

9. In December, 1986, CKS entered into an agreement with the trustee in bankruptcy to purchase the remaining assets of Airways, consisting of four jet engines, two air carrier certificates issued by the CAB in the name of American International Airways, Inc., the tax loss carryover of Airways (approximately 50 million dollars) and 100% of Airways' stock.

10. The bankruptcy court approved the CKS purchase agreement on December 31, 1986.

11. The parties executed a series of stipulations between December 29, 1988 and July 18, 1989 wherein defendant agreed to give notice to plaintiff before resuming business under the American International name, which it did on June 16, 1989, and plaintiff agreed not to seek injunctive relief unless and until receiving such notification.

*The Parties' Respective Service Marks*

12. On October 28, 1975, AIG registered the service mark "American International" with the United States Patent and Trademark Office (USPTO) on the Principal Register. The scope of this registration was limited to the underwriting of insurance.

13. On April 14, 1981, AIG registered the service mark "American International," for use in insurance, insurance related services, and financial related services, with the USPTO.

14. On February 23, 1982, AIG registered the service mark "American International," for use in real estate investment services with the USPTO.

15. On February 14, 1984, Airways registered the service mark "American International," for use in providing passenger air transportation services with the USPTO.

16. AIG first notified Airways in a letter of October 24, 1984, with copies to the bankruptcy court and trustee, that it viewed its use of the mark "American International" as an infringement upon AIG's rights in the same mark.

17. On April 18, 1985, the PTO denied an AIG application to register the service mark "American International" for use in providing air transportation services based on a likelihood of confusion with Airways' previously registered mark. This denial was made final in a PTO order of December 30, 1985. (A 1989 motion by AIG to cancel Airways' service mark registration on the grounds of abandonment is now pending before the PTO.)

18. AIG has used the descriptive marks "American International" and "AIG" since 1926; has expended large sums advertising its insurance and financial services under those names on television and in publications such as *Time, U.S. News and World Report, Newsweek, Forbes, Fortune, Business Week, USA Today, The Washington Post, The New York Times, The Wall Street Journal;* and, has a subsidiary, American Aviation Agency, which maintains a listing in the World Aviation Directory as an aviation insurer.

19. The name "American International" has been and is currently used by numerous unrelated third parties in connection with a multitude of services including car rentals, passport photos, auctioneering, film distribution, hospital services, publishing and air transportation services. A company called American International Airlines is listed in the World Aviation Directory (Winter 1988) as providing air cargo charter services.

20. On October 23, 1984, AIG executed an agreement with American International Rent–A–Car in which AIG recognized the latter's right to use the name "American International" in providing vehicle related services.

*The Parties' Aviation Activities*

21. American International Aviation Corporation ("AIAC"), a subsidiary of AIG, owns two small jet aircraft, a "Gulfstream G4" and a "Falcon 900."

22. These aircraft are used almost exclusively by AIG to transport its personnel, brokers and clients for corporate purposes.

23. AIG has periodically provided its aircraft to other corporations for their in-house use on a time-share basis, and over the past five years or so has had such interchange arrangements with Metrome-

dia Corporation, Texaco, Gulfstream and Bowater Paper.

24. AIG and Hoechst–Celanese Corporation currently use each other's corporate aircraft on a time-share basis, and this is the only such interchange agreement AIG currently maintains.

25. In late 1985, AIG as operator of a jet aircraft, and Mid–Atlantic Aviation Corporation ("Mid–Atlantic"), as owner of that aircraft, entered into a charter agreement with Jet Aviation–Charter Services, Incorporated ("Jet Aviation"), to make that corporate aircraft available for charter use by third parties with AIG providing crew and maintenance services.

26. Jet Aviation did not and, under its U.S. Department of Transportation (DOT) § 401 fitness certificate, legally could not offer, advertise or provide these air charter services to the public under the name "American International."

27. AIG's agreement with Jet Aviation expired in December of 1988.

28. In 1987, AIG entered into an agreement with Allen and Company to provide crew and maintenance service for aircraft Allen leased from Mid–Atlantic, which expired in December of 1988.

29. Currently, 80% of the flying time of AIAC's two jets is used for AIG's corporate purposes—*i.e.*, transporting AIG officers, employees, brokers and customers, and 20% is utilized under the time sharing interchange agreement with Hoechst–Celanese.

30. AIG maintains facilities for its corporate aircraft at Teterboro Airport, Teterboro, New Jersey, consisting of a hanger, maintenance shop, business office and lounge or waiting area.

31. In addition to using these facilities for its own corporate use, AIG presently leases them to ROP Corporation and Metromedia, and has leased them to other corporations in the past.

32. Airways provided cargo and passenger air transportation services under the name "American International" from November 18, 1981 until September 17, 1984.

33. To provide public air transportation services, a common carrier must obtain a fitness certificate (or a "section 401 certificate") pursuant to the Federal Aviation Act, 49 U.S.C.App. § 1371(a), and an air carrier operating certificate from the Federal Aviation Administration (FAA), pursuant of 14 C.F.R., Part 121 and/or Part 135.

34. On January 30, 1987, Airways submitted to DOT a Notice of Intent to resume airline operations, as required by DOT regulation, and on February 2, 1987, Airways filed an application with DOT to reactivate its operating authority.

35. On May 18, 1989, DOT reissued to Airways a section 401 certificate "to engage in interstate and overseas air transportation of persons, property and mail," however, Airways agreed to limit its current operations to cargo, although it intends to re-institute passenger services, and thus, DOT has deferred making specific findings on its fitness to provide such service.

36. Airways now is in the process of obtaining an air carrier operating certificate, upon receipt of which it will be authorized to offer air cargo transportation services to the public under the name American International.

37. Neither AIG nor any of its subsidiaries provide or advertise air transportation services to the public.

38. The evidence of record indicates that AIG's corporate jets have never been used to provide charter cargo services.

39. AIG does not possess either a section 401 certificate or an air carrier operating certificate, and thus legally cannot provide air carrier service to the public. (Pursuant to 14 C.F.R. § 215.2, an air carrier can only provide aviation transportation services to the public in the name of the entity in its section 401 certificate.)

40. AIG, its subsidiaries and contractees do not, and cannot, provide air transportation services to the public under the name "American International."

41. It is highly improbable that AIG or any of its subsidiaries would enter the air

carrier business as this would place AIG in direct competition with some of its major insurance customers.

42. Airways' target customers for cargo services are major freight forwarders such as Emery Air Freight and UPS, automobile companies and the military.

43. Airways anticipates targeting its passenger services towards tour operators, the military and other airlines.

44. Airways' right to provide air transportation services under the name "American International" was a critical factor in CKS's decision to purchase Airways' stock.

45. Despite Airways' bankruptcy status, its dormant air carrier certificates in the name American International Aviation, Inc. were valuable commodities.

46. CKS aircraft were involved in three accidents in 1986–87, and nine other unidentified "incidents" between 1986 and 1988.

47. After these accidents and incidents were investigated by the FAA and the National Transportation Safety Board, and after reviewing CKS initiatives after a 1987 independent safety audit it commissioned, as well as the backgrounds of the persons who will operate Airways, DOT found Airways fit to conduct air carrier services.

*Actual Confusion*

48. AIG once received at its Teterboro Airport facility a shipment of life rafts that were intended for Airways.

49. AIG received an unspecified amount of mail that was addressed to Airways, some of it after Airways ceased operations in October of 1984.

50. On one occasion, a potential Airways customer called an AIG employee at its Teterboro Airport facility to inquire about a charter flight to Atlantic City.

51. The evidence of record on this point, which is at best vague, indicates that actual confusion was minimal.

*Irreparable Harm*

52. Plaintiff adduced no convincing evidence of irreparable harm.

*Harm to Defendants*

53. If defendants are prohibited from operating as Airways when FAA issues its air carrier operating certificate, they would be forced to market their services under another name and thus would be effectively permanently deprived of the use of this mark.

*Public Interest*

54. Plaintiff has adduced no convincing evidence of a public interest in foreclosing defendants' use of the Airways name, and defendants have adduced no convincing evidence of any harm to the public interest if they are forced to fly under another name.

## ANALYSIS

A party seeking a preliminary injunction bears the burden of demonstrating that (1) there is a reasonable probability the party will succeed on the merits and (2) the party will be irreparably harmed by denial of preliminary relief. The court should also consider whether (3) granting such relief will result in greater harm to the other parties and (4) granting preliminary relief is in the public interest. *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978).

AIG brought two causes of action under the Lanham Act, one for infringement of a service mark pursuant to 15 U.S.C. § 1114,[2] and one for unfair competition pursuant to 15 U.S.C. § 1125(a). The elements of both causes of action are similar, however, and the same factual analysis will support an action for either. *Schutt Manufacturing Co. v. Riddell, Inc.,* 673 F.2d 202, 206 (7th Cir.1982).

To prevail on the merits in an infringement action involving use of descriptive marks[3] for non-competing servic-

2. Under the Lanham Act, as well as Pennsylvania common law, service mark and trademark rights and infringement are governed by identical standards. *See Blumenfeld Development v.*

*Carnival Cruise Lines,* 669 F.Supp. 1297, 1317 (E.D.Pa.1987).

3. At oral argument plaintiff stated that its mark "arguably" is an arbitrary or distinctive one.

es, a plaintiff must establish that its mark has acquired "secondary meaning" in defendant's market [4] and that there is a likelihood of confusion as to the source of the respective services.[5]

### I. Secondary Meaning and Likelihood of Confusion

"Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source." *Scott Paper Company v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978) (citations omitted).

Likelihood of confusion, although conceptually distinct from secondary meaning, is, in practice, indistinguishable. As the Third Circuit has stated, "proof of one is proof of the other." *Interpace Corporation v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). In *Interpace*, in determining likelihood of confusion, the Court applied the same factors it employed in *Scott Paper* in determining the presence or absence of secondary meaning.

Where a complainant and alleged infringer offer competing goods or services, the court need rarely look past the similarity of their marks. Where, however, the parties are involved in non-competing lines of services, the courts must look beyond the similarities of the mark and examine the nature of the services involved, and the context in which they are marketed and sold. The more related the services and the more similar the sales context, the greater the likelihood of confusion. *Id.*

AIG is primarily in the insurance business and also provides, financial and real estate investment services. Defendants are in the business of providing commercial passenger and cargo air carrier services. Although AIG does own two aircraft,[6] they are used almost entirely for corporate purposes, *i.e.*, transporting corporate officers, clients, brokers and employees. Neither this nor the limited use of its jets on a time-share basis with other corporations puts AIG in the business of providing public air transportation services. AIG has failed to adduce sufficient evidence from which the court fairly can con-

---

Geographical marks are primarily descriptive, and no one is entitled to use exclusively a common geographic term. *See* 3 Callmann, *Unfair Competition, Trademarks and Monopolies* § 18.15 at 175–76, 4th ed. (1989). Marks such as plaintiff's which pertain to the market in or area over which service is provided are descriptive. *See National Conference of Bar Examiners v. Multistate Legal Studies*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *American Diabetes Association v. National Diabetes Association*, 533 F.Supp. 16, 19 (E.D.Pa.1981), *aff'd*, 681 F.2d 804 (3d Cir.1982).

**4.** AIG's three registrations are limited to insurance and financial services, and thus provide protection for the mark only as to those services. 15 U.S.C. § 1057(b). *See also Park'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 204, 105 S.Ct. 658, 666, 83 L.Ed.2d 582 (1985); *Natural Footwear Limited v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir.1985), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985).

**5.** The more sound view appears to be that even an arbitrary mark is presumed to have second-

ary meaning only in markets in which it is used, as this is the limit of protection afforded by registration of a descriptive mark upon a finding that it has, in fact, acquired secondary meaning. Even courts which have held that an arbitrary or suggestive mark user need not establish secondary meaning in an unrelated market to restrain use therein, however, have required proof of likelihood of confusion which the Third Circuit aptly recognized in *Interpace*, *infra*, is virtually indistinguishable in its proof and legal effect from secondary meaning. *See McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979).

**6.** There is a reference in a deposition to several AIG affiliates having their own corporate jets, but there is no evidence of record as to the uses of these jets or the names under which they fly. The only evidence regarding corporate jet use concerned the use of AIAC's two jets and a jet owned by Mid–Atlantic with whom AIG had entered into a charter agreement. Thus, the existence of other corporate jets within the AIG family is not relevant to the Court's decision.

clude that it competes in the air carrier market.

Further, AIG legally cannot provide air carrier services because it does not possess a section 401(a) certificate or an air carrier operating certificate. *See* 49 U.S.C.App. § 1371(a); 14 C.F.R. Parts 121, 135 (1989); 14 C.F.R. Part 91. Any use of AIG's jets by another carrier pursuant to a lease or charter agreement must be performed under the name of the certified carrier, not AIG. 14 C.F.R. § 215.2.

■ Nevertheless, AIG may still establish secondary meaning and likelihood of confusion of its mark in a market in which it has not applied it. *See Interpace*, 721 F.2d at 465; *Scott Paper*, 589 F.2d at 1228. AIG must establish secondary meaning of its mark in defendants' market, but need not have entered that market to prevail. *Interpace, supra.*

■ The Third Circuit has applied ten factors in determining secondary meaning: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper*, 589 F.2d at 1229. The same factors are used in determining likelihood of confusion. *See Interpace*, 721 F.2d at 465. Application of these factors leads the court to conclude that AIG has failed to demonstrate likelihood of confusion or sec-

ondary meaning of its mark in defendants' market.

### 1. *Similarity of AIG's Mark with Airways' Mark*

The respective service marks at issue here are virtually identical. The fact that plaintiff typically uses the term "Group" or another term in conjunction with its mark whereas defendant's mark is "American International Airways" is of no practical consequence.

### 2. *Strength of AIG's Mark*

AIG's mark is strong in connection with insurance and financial services. Plaintiff has failed to adduce, however, sufficient evidence to show that its mark has developed any significant recognition in defendants' market. The fact that third parties are using the name "American International" in connection with a multitude of services, such as car rentals, passport photos, auctioneering, publishing, film distribution, hospitals and a variety of other services, including air charter services by a company called American International Airlines, generally lessens the strength of AIG's mark in markets other than insurance, finance and real estate. *Cf. Paramount Pictures Corporation v. Dorney Park Coaster Co.*, 698 F.Supp. 1274, 1279 (E.D.Pa.1988) (third party use of mark relevant in weighing strength of owner's mark and likelihood of confusion).

### 3. *Care and Attention Expected of Consumers in Making Purchases*

Chief financial officers and other corporate officials who purchase major insurance coverage, pension plans and key financial services can be expected to exercise great care and attention in deciding upon such purchases. Individuals or corporations with valuable cargo shipments can be expected to exercise considerable care and attention in deciding to whom to entrust the delivery of such items. Members of the general public, to the extent defendants solicit their patronage, reasonably could be expected to exercise limited care and attention in selecting a carrier for personal

transportation, and would likely be influenced more by the schedule, time and convenience of the service than by the source of such service. It does not appear that defendants' proposed operations would pose any serious threat of confusion of plaintiff's potential clientele.

#### 4. *Length of Time Defendant has Used Mark Without Confusion*

Plaintiff contends this factor is not applicable because Airways has not yet resumed operations. Airways operated from 1981 to 1984, however, and the evidence of record shows that during this period actual confusion between Airways and AIG was minimal. AIG received one shipment and one telephone call intended for Airways. The only other evidence of actual confusion involves misdelivery of everyday business mail. This consists of the statement of one AIG employee that she received "a lot" of Airways mail "in the beginning," but that once she notified AIG's mail carrier of this problem, it stopped. Such instances of actual confusion over a period of three years are minimal.

#### 5. *The Intent of Airways in Adopting the Mark*

There is no evidence of record of bad faith by Airways or CKS in the decision to use the name "American International." AIG's sole contention regarding defendants' intent is that bad faith is shown by their determination to use the "American International" name despite AIG's October, 1984 claim of infringement. This contention is unpersuasive as defendants have a good faith claim of right to use the registered service mark for which they paid.

#### 6. *Evidence of Actual Confusion*

As previously indicated, there has been little evidence of actual confusion during the period that Airways and AIG operated concurrently. This evidence is insufficient to support plaintiff's position. *Compare Scott Paper*, 589 F.2d at 1231 (error for court to find pattern of confusion based on

nineteen misdirected letters during a four-year period).

#### 7. *Marketing Through Similar Channels of Trade, Advertising and Media*

There is little evidence of record concerning where and how Airways intends to market its services. Nevertheless, AIG's extensive marketing and advertising appears to cover most available channels. AIG regularly advertises in general circulation publications and insurance journals, and has advertised its insurance services in aviation journals and on national television.[7]

#### 8. *Similarity of Parties' Sales Targets*

The evidence of record indicates that defendants will be targeting charter tour operators, the military and major freight forwarders. Arguably, plaintiff might also target the latter in its insurance-related promotion efforts. It also appears that defendants may target other airlines from whom plaintiff has solicited or will solicit insurance business. In this regard, however, it should be noted that while the parties' corporate sales target may be the same, the actual decision maker typically will be different. In the purchase of insurance and financial services it will be the corporation's chief financial officer generally recommending purchase decisions, whereas typically schedulers, traffic managers and administrative personnel select air carrier services.

#### 9. *The Relationship of Respective Parties' Services in Minds of Consumers Because of Similarity of Functions*

AIG has failed to demonstrate that it provides commercial aviation services. It provides insurance, underwriting and other financial services which simply are not similar to air transportation services. The fact that AIG provides insurance to air carriers no more puts it in the air transportation business than insuring auto manufacturers,

---

**7.** AIG, however, does not solicit customers or advertise its corporate jets for the purpose of providing air transportation services. (Deposition Testimony of John Mendes, pp. 121–22.)

nursing homes or restaurants would put it in those businesses. The limited amount of passenger transportation AIG provides via its corporate jets also does not put it in the commercial aviation field. The parties do not offer similar services and consumers likely would not deem the parties' services to be related.

### 10. *Other Factors Suggesting Consumers Might Expect AIG to Enter Defendants' Market*

AIG suggests that it might, through natural corporate growth, be expected to enter the air carrier business. The evidence of record, however, conflicts with such an inference. The Chairman and CEO of AIG Aviation, Inc.,[8] testified that "it would be very confusing for us to be in the aviation insurance business and also try to be in the commercial aviation business in a passenger or a cargo carrying capacity," and that AIG Aviation's insurance customers "would be highly annoyed if we got into the same business that they are in as a competitor." Thus, the evidence indicates that it is unlikely that an AIG company would enter the commercial air transportation field and unlikely that AIG's customers would believe they had entered that field.

Moreover, an assumption that an insurer and financial services provider had entered the air transportation field would not be logical. That a corporation owns several planes no more gives rise to a reasonable assumption that it had entered the public air transport business than would its ownership of automobiles for corporate use give rise to a reasonable expectation that it would enter the auto rental business. If not, then the public might reasonably expect virtually all of the Fortune 500 corporations which own planes and automobiles to enter the commercial air and ground transportation services fields, however unrelated their basic product or service lines may be thereto.

**8.** AIG Aviation, Inc. is a subsidiary of plaintiff which provides aviation insurance to foreign and domestic airlines.

## II. Abandonment

AIG also argues that Airways has abandoned its registered service mark, as defined by 15 U.S.C. § 1127:

> a mark shall be deemed to be "abandoned"—
>
> (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

■ Because Airways has, admittedly, not used its trademark in nearly five years, there is prima facie abandonment pursuant to section 1127. However, " 'prima facie abandonment' as used in [section] 1127 means no more than a rebuttable presumption of abandonment." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). Objective facts can explain nonuse, thereby negating the inference of intent to abandon, and the presumption under section 1127. *Id.*

■ To establish abandonment, it is necessary to show actual intent to abandon. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138 (3d Cir.1981). The evidence before the court does not establish defendants' intent to abandon its mark. The evidence demonstrates that Airways was in bankruptcy and that insufficiency of capital precluded the active use of its mark. AIG relies exclusively on the series of stipulations between the parties in this case for its assertion that Airways intended to abandon its mark. In these stipulations, defendants stated they had no present intent to use the name "American International," and would notify AIG if and when they decided to resume use of the name. This express recognition of potential future use is, in fact, inconsistent with an intent to abandon the Airways' name.

As early as October, 1987, DOT issued an Order in which it recognized that defendants intended to use the mark "American International" once Airways obtained approval to resume operations. (*See* Dot Or-

der, No. 87–10–7; Miller Exhibit K.) Finally, the fact that CKS has expended time, money and effort to obtain Airways' air carrier certificates and the right to use the name American International evidences CKS's intention from the beginning to use Airways' name.

The plaintiff has failed to establish a reasonable probability that it will succeed on the abandonment issue.

 Similarly, AIG contends that Airways lost any right in the mark it may have had once the bankruptcy trustee began selling off its assets, citing *Hough Manufacturing Corp. v. Virginia Metal Industries Inc.*, 453 F.Supp. 496 (E.D.Va. 1978). A business' good will and the mark symbolizing it are not automatically lost when the business loses or sells its tangible assets or ceases active operations, although good will may eventually fade if operations and use of the mark are not resumed. *Defiance Button Machine Company v. C & C Metal Products Corp.*, 759 F.2d 1053, 1062 (2d Cir.1985), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Although the majority of Airways' tangible assets were disposed of prior to the CKS agreement, unlike the plaintiff in *Hough*, CKS purchased more than a bare trademark for a very nominal sum. It purchased 100% of the corporation's stock and a valuable asset: the air carrier certificates in the name of American International Airways which gave CKS the potential to invoke their authority and recommence service. It does not appear on the present record that Airways' trademark and the good will associated with it were extinguished by the trustee and, therefore, that there is a reasonable probability that AIG will prevail on the merits as to this issue.

III. Irreparable Harm

AIG must also establish irreparable harm to obtain preliminary injunctive relief. On this issue particularly, plaintiff has substituted argument for evidence.

AIG asserts it will be irreparably harmed by the loss of control over its reputation and good will. The evidence before the court fails to establish that such diminution in reputation would occur absent a preliminary injunction.

 A reasonable probability of success in proving service mark infringement alone may entitle a plaintiff to injunctive relief because irreparable harm may be presumed. *See GTE Corporation v. Williams*, 731 F.2d 676, 678 (10th Cir.1984). This presumption, however, is undermined where a plaintiff delays seeking relief. *Id. See also Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985). Although there is no evidence that AIG consciously delayed bringing an action, the record establishes that Airways operated concurrently with AIG for three years without a scintilla of evidence that AIG was harmed thereby. Moreover, because AIG has failed to make a preliminary showing of infringement, no presumption of irreparable harm arises at all.

That Airways operated for three years without any apparent harm to AIG also militates in favor of the finding that AIG would not suffer any irreparable harm if it is denied a preliminary injunction. *Cf. Citibank*, 756 F.2d at 276 (delay in seeking injunctive relief may justify denial of preliminary injunction on grounds of lack of irreparable harm); *Country Floors, Inc. v. A Partnership Composed of Charley Gepner and Gary Ford, d/b/a Country Tiles*, 11 U.S.P.Q.2d 1401, 1989 WL 70719 (E.D.Pa. June 23, 1989).

AIG also argued that it would be irreparably harmed because of the past accidents and incidents in which CKS aircraft were involved. Since none of these matters involved Airways, it is doubtful that they would harm AIG's reputation, even if one assumed that there would be confusion between Airways and AIG. AIG's suggestion that these past occurrences indicate a likelihood of future accidents with Airways craft is unfortunate and without merit. The court will not speculate as to whether air accidents involving Airways might occur in the future and possibly reflect upon the AIG image. Moreover, the evidence of record indicates that DOT has determined

that CKS and its relevant personnel are fit to operate Airways.

AIG argued that because Airways had been bankrupt, its resumption of business under its mark "may" result in adverse inferences about AIG which could affect the price at which its shares are traded. Investors who trade in any significant way in the stock markets are very unlikely to be confused as to whose shares they are buying. Even assuming some degree of confusion, the court is left to speculate that stock traders will be affected adversely by the fact that a company has emerged successfully from a Chapter 11 reorganization. Moreover, if one accepts this view of irreparable harm, every company emerging from a bankruptcy could be precluded from using its name by a going concern with a similar name even if the latter is in an unrelated market and its name has no secondary meaning in any other market.

Finally, AIG claims that its pilots and employees receive "preferential" treatment from airport personnel because AIG is a "good customer." It suggests that this treatment will be jeopardized once Airways reenters the air carrier market. Even assuming that loss of preferential treatment may constitute irreparable harm, the limited testimony on this subject is rather subjective and vague. There is no indication as to what personnel provide what preferential treatment or where. Moreover, AIG's corporate planes have no logo but only are identified by their numerical tail markings. Thus, airport personnel still would be able to distinguish them from defendants' craft. (*See* deposition testimony of J. Mendes at 143–147.)

Finally, AIG's position is weakened substantially by the proliferation of use of the name "American International" by numerous third parties. (*See* Warner Exhibit C; Priesing Exhibit H.)

There is no factual basis upon which to conclude AIG will be harmed by Airways' resumption of service.

## IV. AIG's Claims Pursuant to Pennsylvania Common Law and Anti–Dilution Statute

AIG also asserted claims under Pennsylvania's Anti–Dilution statute, 54 Pa.Cons.Stat. Ann. § 1124,[9] and Pennsylvania common law. To sustain a cause of action under either theory, a user must have secondary meaning in his mark in the alleged infringer's market. *See Ginger Groups, Ltd. v. Beatrice Companies, Inc.,* 678 F.Supp. 555, 560–61 (E.D.Pa.1988). *See also Standard Terry Mills, Inc. v. Shen Manufacturing Co.,* 803 F.2d 778, 780 n. 4 (3d Cir.1986); *Moore Push–Pin Co. v. Moore Business Forms, Inc.,* 678 F.Supp. 113, 117–18 (E.D.Pa.1987).[10] Because AIG has failed to establish a reasonable probability of success on the merits on its claim based upon secondary meaning, the injunction must similarly be denied with regard to plaintiff's common law and section 1124 claims.

## CONCLUSION OF LAW

1. AIG has failed to demonstrate a reasonable probability that it will prevail on its claim that the service mark "American International" has developed secondary meaning in the air carrier service market.

2. AIG has failed to demonstrate a reasonable probability that it will prevail on its claim that there is a likelihood of confusion between the source of plaintiff's services and that of defendants'.

3. AIG has failed to demonstrate a reasonable probability that it will succeed on its claim that Airways abandoned its service mark.

**9.** Section 1124 provides:
 Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of

confusion as to the source of goods or services.

**10.** AIG also would have a cognizable action pursuant to section 1124 if the mark were registered under the Pennsylvania Trademark Act; however, there is no evidence of such registration.

4. AIG has failed to demonstrate a reasonable probability that it will succeed on its claims for relief under Pennsylvania common law or the Pennsylvania Anti–Dilution statute, 54 Pa.Cons.Stat. Ann. § 1124.

5. AIG has failed to demonstrate that it will suffer irreparable harm if preliminary injunctive relief is not granted and defendants are allowed to use the name "American International Airways" in connection with commercial air carrier services.

6. Airways would suffer greater harm if a preliminary injunction were issued than would AIG if one were not.

7. Plaintiff has failed to sustain its burden of proof entitling it to a preliminary injunction.

ACCORDINGLY, this 25th day of August, 1989, IT IS HEREBY ORDERED that plaintiff's Motion for a Preliminary Injunction is DENIED.