SCOTT PAPER COMPANY, a
corporation

v.

SCOTT'S LIQUID GOLD, INC., a
corporation, Appellant.

No. 78–1166.

United States Court of Appeals,
Third Circuit.

Argued Oct. 5, 1978.

Decided Dec. 12, 1978.

1226

Herbert Blecker, Watson, Leavenworth, Kelton & Taggart, New York City, for appellant; Nicholas John Stathis, Robert E. Kosinski, Watson, Leavenworth, Kelton & Taggart, New York City, James F. Burnett, Potter, Anderson & Corroon, Wilmington, Del., of counsel.

Rudolf E. Hutz, Connolly, Bove & Lodge, Wilmington, Del., for appellee; James M. Mulligan, N. Richard Powers, Connolly, Bove & Lodge, Wilmington, Del., John W. Kane, Jr., John A. Weygandt, Scott Paper Co., Philadelphia, Pa., of counsel.

Before ROSENN and WEIS, Circuit Judges, and HANNUM, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

In his classic "Essay on Walking," Thoreau expressed the notion that there is nothing in a name. This view has been vigorously rejected by both parties to this litigation, not to mention almost all of mankind to whom a name is an important means of identification. Very often, intangible connotations which are not facially apparent are attached to a name. The long history of the development and growth of the companies involved in this controversy bears testimony to the force of the biblical aphorism that "a good name is better than precious oil,"[1] particularly in the corporate and commercial life of this nation.

The primary issue raised on this appeal is whether the surname "Scott," a registered mark applied to plastic and paper household products, had acquired a secondary meaning of such significance as to bar its use on noncompeting products. Scott Paper Company ("Scott Paper") filed suit against Scott's Liquid Gold, Inc. ("SLG"), in the United States District Court for the District of Delaware alleging infringement of trademarks, false attribution of origin of its product, and unfair competition. After a bench trial on the merits, the district court granted a permanent injunction, enjoining SLG from using the surname "Scott" in its trade name, but denying plaintiff's request for money damages, an accounting, and attorney's fees, *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 439 F.Supp. 1022 (D.Del. 1977). The district court reached the following principal conclusions: (1) that Scott Paper had established a secondary meaning in "Scott" for household cleaners; (2) that it had established a likelihood of confusion between the two trademarks; (3) that Scott Paper's mark had priority; and (4) that Scott Paper had not been guilty of laches. SLG appealed. We reverse and vacate the judgment.

### I.

Our review of the facts will be brief; a more detailed recitation can be found in the district court opinion. Defendant's origin can be traced to Lee Scott of Colorado, who, as early as 1925, manufactured, and sold door-to-door, a furniture polish under the name of Scott's Liquid Gold. For a long time this remained a small operation confined to the Denver area with some change in ownership. In 1951 a partnership purchased the business for $350. Three years later, it was incorporated in Colorado under the name of Scott's Liquid Gold, Inc., and efforts were made to develop a nationwide market for the product.

Not until 1969 did sales of the furniture polish show significant signs of improvement. In that year, the company decided to sell shares of its stock to the public. The proceeds derived went largely into advertising, generating a marked rise in revenues. As the figures demonstrate, the business expanded dramatically in the 1970's.[2] On May 24, 1971, SLG applied for registration of the trademark "Scott's Liquid Gold" in the United States Patent Office. The mark

---

* John B. Hannum, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Ecclesiastes 7: 1.

2.

| | Sales | Advertising and Promotion Expenses |
|---|---|---|
| 1968 | $ 92,000 | $ 12,000 |
| 1969 | 177,000 | 104,000 |
| 1970 | $ 1,105,000 | $ 688,000 |
| 1971 | 5,897,000 | 3,068,000 |
| 1972 | 14,991,000 | 7,428,000 |
| 1973 | 16,276,000 | 10,318,000 |
| 1974 | 12,694,000 | 5,394,000 |
| 1975 | 8,559,000 | 1,871,000 |

was officially published for opposition purposes. When notice of it came to Scott Paper's attention, it requested and received a thirty day extension to investigate a possible conflict, but then decided not to oppose it. On December 19, 1972, the Patent Office issued its registration of the trademark.

Plaintiff, Scott Paper, has been selling paper goods since 1879. The earliest use of the company name on a product appears to have been 1911, when the company began selling Scot-Tissue paper towels. In 1916, Scott Paper obtained a federal trademark registration for this name. By 1925, sales of Scott Paper products aggregated nearly 4 million dollars nationwide. Over the years, the company prospered and expanded. By 1975 its annual sales exceeded 450 million dollars. During this time, additional trademark registrations were obtained. In all, nineteen trademark registrations allegedly have been infringed by the defendant. None of these, however, pertain to a furniture polish.

## II.

The appellant challenges each of the four primary conclusions reached by the district court. We will address the first three of these conclusions. In view of our disposition of the case on the merits, we find it unnecessary to decide SLG's contention that laches barred any relief to Scott Paper.

■ Under the common law and the Lanham Act, 15 U.S.C. §§ 1051–1127, owners of trademarks are protected from other marks that are likely to cause confusion. However, a non-distinctive trademark, such as a common-name mark, only achieves protection if the mark is shown to have secondary meaning. See Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 498–99 (2d Cir. 1962); 3 Restatement of the Law of Torts, § 716(b) and Comment b (1938). Proof of secondary meaning was Scott Pa-

per's first hurdle in its action for infringement.

■ Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. E. g., Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 697 (2d Cir. 1961); G & C Merriam Co. v. Saalfield, 198 F. 369, 373 (6th Cir. 1912), cert. denied, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917). Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source. F. S. Services, Inc. v. Custom Farm Services, Inc., 471 F.2d 671, 674 (7th Cir. 1972). Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark. The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark. "The trademark laws exist not to 'protect' trademarks, but . . . to protect the consuming public from confusion, concomitantly protecting the trademark owner's right to a non-confused public." James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 276 (7th Cir. 1976).

■ Under certain circumstances, a trademark can develop a secondary meaning as to goods or services to which the mark has not been applied. Reasons advanced by this court for extending protection of a trademark into a noncompeting market are the potential dangers that: (1) the reputation of the holder of the mark may be tarnished or (2) the user of an infringing mark may be attempting to benefit from the general goodwill developed by the holder of the protected mark. Wall v. Rolls-Royce of America, Inc., 4 F.2d 333, 334 (3d Cir. 1925); Akron-Overland Tire Co. v. Willys-Overland Co., 273 F. 674, 676 (3d Cir. 1921).

SLG does not contest the district court finding that Scott Paper has established secondary meaning for *paper goods.* SLG does contest, however, the court's conclusion that Scott Paper "has secondary meaning in the use of 'Scott' as an endorsement on household cleaners." This holding prompted the district court to decide that the mark deserved protection beyond the scope of its actual use—paper and plastic wares—and that it could attach to other goods, namely household cleaners. Unfortunately, the court failed to delineate explicitly the evidence upon which it relied in concluding that Scott Paper had satisfied its burden of proving secondary meaning in a noncompeting market. The extensive discussion in the district court's exhaustive opinion of the evidence presented at trial focuses on the likelihood of confusion, not secondary meaning. Likelihood of confusion is an analytically distinct, albeit closely related element of the case. Even assuming *arguendo* that proof of likelihood of confusion is *a fortiori* proof of secondary meaning, we believe that the trial court erred in concluding that sufficient likelihood of confusion exists in this case to warrant injunctive relief.[3]

Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. *See James Burrough Ltd. v. Sign of the Beefeater, Inc., supra,* 540 F.2d at 275. The trial court carefully enumerated the factors to be considered in making this determination: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of

the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market. 439 F.Supp. at 1036–37. *See Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1173 (2d Cir. 1976); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 381–82 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

The district court dwelt in his analysis of likelihood of confusion primarily upon the parallels in marketing and use. It assumed that as the number of similarities between two products increases, the distinctions between the markets blur and a single market shared by both products emerges. Furthermore, the court believed that in a shared market of narrow scope, the likelihood of confusion between two products bearing similar marks is enhanced.

The court was persuaded that the similarities it found held a "potential for confusion of source or sponsorship." Both the furniture polish and the paper products are designed by the companies to be sold to female heads of households. Both companies advertise through the same type media with emphasis on network television and national women's magazines. They often use the

**3.** The numerous findings of fact in this case are subject to Fed.R.Civ.P. 52(a) and should only be disturbed if clearly erroneous. *See Krasnow v. Dinan,* 465 F.2d 1298, 1302 (3d Cir. 1972). But the inferences drawn from basic facts by the district court are subject to a less restricted review. *See Sears, Roebuck & Co. v. Johnson,* 219 F.2d 590, 591 (3d Cir. 1955). Furthermore, in cases decided primarily on

documentary evidence, as in this case, we are in an equally good position to evaluate the evidence and need not be as constrained as in cases where credibility of a witness may be in issue. *See In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601, 603 (3d Cir. 1976); *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d Cir. 1975); 5A Moore's Federal Practice ¶ 52.05.

same retail outlets. Supermarkets and grocery stores account for 90 percent of Scott Paper sales and 85 percent of SLG's. The items are relatively inexpensive and consumers cannot be expected to examine the labels carefully. Paper towels are functionally related to furniture polish in that they are often used together. Although Scott Paper does not now sell household cleaners, the district court found that the household cleaning market may be a logical area for Scott Paper's expansion. Finally, both marks use the same name "Scott" to identify the source of the goods. 439 F.Supp. at 1038–40.

We believe that the trial court erred in concluding from these facts that a likelihood of confusion sufficient to warrant injunctive relief exists in this case. Notwithstanding the parallels in marketing techniques and goals of the two companies, these parallels encompass a substantial number of distinct market areas. Although the products of each company are advertised on television, sold primarily in supermarkets, and are designed to be sold to female heads of households, these circumstances do little to narrow the scope of the market shared by both. In cases where the courts have found a likelihood of confusion between two non-competing goods, the relationship between the products was considerably closer. See Scarves by Vera, Inc. v. Todo Imports Ltd., supra (women's scarves and apparel with women's cosmetics and fragrances); James Burrough Ltd. v. Sign of the Beefeater, Inc., supra (liquor with restaurant selling liquor); Union Carbide Corp. v. Ever-Ready, Inc., supra (batteries and lamps with lightbulbs and lamps); Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., 350 F.Supp. 1341 (E.D.Pa.1972), aff'd without opinion, 480 F.2d 917 (3d Cir. 1973) (pipe tobacco and bar accessories with scotch whiskey). These decisions can be contrasted with cases in which use of a trade name was not proscribed, cases which we believe bear a greater resemblance to this appeal: S. C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129 (6th Cir.), cert. denied, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959) (floor wax and cleaner and furniture polish with brooms and mops); S. C. Johnson & Son, Inc. v. Johnson, 116 F.2d 427 (2d Cir. 1940) (floor wax and cleaner and furniture polish with fabric cleaner).

Furthermore, the court in evaluating the likelihood of confusion also believed that future expansion into the household cleaning market was a logical step for Scott Paper, but it ignored the absence of evidence showing that other paper companies sell liquid cleaners, or that the production processes for the contested goods are similar. Cf. Scarves by Vera, Inc. v. Todo Imports Ltd., supra, 544 F.2d at 1174–75 (proof that most leading fashion designers sell perfumes and cosmetics under their own trademarks is evidence of likelihood of confusion). Judge Learned Hand's analysis of a similar situation is also apropos here:

[A]lthough the plaintiff may at some future time wish to make cleaning fluids, it does not now even intimate such a purpose. We cannot conceive any justification in these circumstances for allowing it to reach a choking hand into a market not its own, and to deprive the defendants of an interest, natural and proper in its origin, and after sixteen years presumably an important element in their business.

S. C. Johnson & Son, Inc. v. Johnson, 175 F.2d 176, 180 (2d Cir. 1949); see S. C. Johnson & Son, Inc. v. Johnson, 116 F.2d 427, 429 (2d Cir. 1940).

Nor did the court consider the intent of SLG in adopting the mark, even though it listed this as a relevant factor. Scott's Liquid Gold was named after its originator, Lee Scott, who began its manufacture more than a half century ago. This good faith explanation of the origin of the accused mark contrasts with the situation sometimes suggested in other cases—adoption of a mark in order to take advantage of the owner's goodwill. See e. g., Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp., supra, 350 F.Supp. at 1363. In addition, defendant's mark had been utilized, albeit on a small scale, for over forty years without any evidence of actual confusion.

Although the district court found the evidence sufficient to support the finding that SLG's use of "Scott's" is likely to cause confusion as to the source of sponsorship of defendant's goods, it also went on to consider evidence of actual confusion. This included letters and phone calls by consumers directed to one party intended to reach the other. The letters were buttressed by depositions of some of the authors. Scott Paper also introduced its 1973 market survey to support a finding of actual confusion. The trial judge properly recognized that the survey design was "flawed," but acknowledged that part of the survey was "confirmatory of the conclusions" already reached. Nonetheless, he was "reluctant to base a holding solely upon the results of the CIR survey." 439 F.Supp. at 1042–44. Thus, we have no difficulty in concluding that the survey does not support a finding of actual confusion.

The evidence of actual confusion in this case is insufficient to determine that injunctive relief is appropriate. The evidence relied on by the district court constituted merely nineteen misdirected letters received between 1972 and 1976 supported by depositions of some of the authors. However, during the same period SLG sold 50 million cans of its products. We think that the court committed error in discerning from this extremely minimal evidence a "pattern of confusion in the marketplace."

Ownership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection.[4] Each case of trademark infringement must be evaluated on its own facts and circumstances. *See Dresser Industries, Inc. v. Heraus Engelhard Vacuum, Inc.*, 395 F.2d 457, 461 (3d Cir.), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968). We conclude that on the facts of this case the district court committed reversible error in holding that Scott Paper had established secondary meaning in "Scott" for the household cleaning market and that a likelihood of confusion existed sufficient to warrant injunctive relief. We believe that "this claim covers too broad a field, and cannot be sustained. The right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto." *S. C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 136 (6th Cir.), *cert. denied*, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959).

We believe that the district court also erred as a matter of law in its formulation of the test for priority. The court correctly observed that relief is only available if the plaintiff establishes priority, but formulated the test that Scott Paper "must demonstrate that its mark was the first to acquire secondary meaning in that other's market." 439 F.Supp. 1044–45. The court thereupon held that plaintiff had as early as 1965 acquired a secondary meaning in household cleaners with the word "Scott's." 439 F.Supp. at 1045. This misperceives the essence of the test.

Priority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced his use of the mark. The district court failed to recognize the distinction between SLG's right to continue using the mark that its predecessor had adopted in 1925 and the separate right to exclude others from using it. Because SLG seeks only the former, we

---

4. When all is said, if a man allows the good will of his business to become identified with a surname so common as Johnson, it is fair to impose upon him some of the risk that another Johnson may wish to sell goods not very far afield; and he must show a substantial interest if he would seriously impair the second Johnson's privilege to use his own name in customary ways.

*S. C. Johnson & Sons, Inc. v. Johnson*, 116 F.2d 427, 430 (2d Cir. 1940).

hold that the proper test is whether Scott Paper had established secondary meaning in the household cleaner market before SLG began using its mark. *See General Radio Co. v. Superior Electric Co.*, 321 F.2d 857, 863 (3d Cir. 1963), *cert. denied*, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); *Speed Products Co. v. Tinnerman Products*, 179 F.2d 778, 781 (2d Cir. 1949); *beef & brew, inc. v. Beef & Brew, Inc.*, 389 F.Supp. 179, 184–85 (D.Or.1974). 1 McCarthy, Trademarks and Unfair Competition, § 16.13 at 585. Thus, even if we were to sustain the district court's finding of secondary meaning and likelihood of confusion, relief would only be available if Scott Paper could prove that secondary meaning in "Scott" existed for household cleaners by 1925.

### III.

The judgment of the district court will be reversed and the case dismissed with prejudice. Costs will be taxed against the appellee, Scott Paper Company.