**FARBERWARE, INC., a Delaware corporation, Plaintiff,**

v.

**MR. COFFEE, INC., a Delaware corporation, Defendant.**

**Civ. A. No. 90–193–JLL.**

United States District Court, D. Delaware.

June 11, 1990.

---

Robert K. Payson and William J. Marsden of Potter, Anderson & Corroon, Wilmington, Del., and Arthur H. Seidel and Nancy Rubner–Frandsen of Seidel, Gonda, Lavorgna & Monaco, P.C., Philadelphia, Pa., of counsel, for plaintiff.

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, Del., and Jane G. Stevens, Jonathan D. Davis, and Thomas P. McCaffrey of Gold, Farrell & Marks, New York City, of counsel, for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

The dispute currently before the Court most assuredly represents the prelude to a war in the coffee maker industry. At stake is the relatively new and potentially lucrative market for microwave coffee makers. In this case, the two parties are rival manufacturers of so-called "high tech," drip-type microwave coffee makers. The plaintiff seeks a preliminary injunction to stop the defendant from manufacturing and distributing its microwave coffee maker because it allegedly infringes upon the trade dress of the plaintiff's product.

The parties have briefed the issues (*see* Docket Item ["D.I."] 20; D.I. 27), and the Court heard oral argument on the motion on May 16, 1990. After consideration of these arguments and the evidence presented, the Court concludes for the reasons set forth below that issuance of a preliminary injunction is not warranted.

## BACKGROUND

Plaintiff, Farberware, Inc. ("Farberware"), is a Delaware corporation which is in the business of manufacturing and selling cooking appliances and related goods in the United States. Defendant, Mr. Coffee, Inc. ("Mr. Coffee"), is also a Delaware corporation, and is in the business of manufacturing and selling coffee and tea related products. Both Farberware and Mr. Coffee manufacture drip-type microwave coffee makers,[1] and these are the products at issue in this litigation.

Farberware maintains that its product, promoted and sold under the trademark "MicroBrew," appears in a distinctive trade dress, for which Farberware seeks protection in this action. MicroBrew's distinctive trade dress allegedly consists of "a black

---

**1.** Farberware contends that it was the first to introduce a drip-type microwave coffee maker. Apparently, the microwave coffee makers that predate Farberware's product were all percolator-type coffee makers. (*See* D.I. 32 at 22; *cf.* D.I. 21, Aff. of Mr. O'Malley at ¶ 14.)

cylindrical container with two distinctive handles, one handle for the lower carafe or mug and the upper handle for the brewing portion of the coffee maker, a black lid, and contrasting white lettering...." [2] (D.I. 1 at ¶ 12; *see also* D.I. 1, Exhibit A [a sample MicroBrew].) Farberware characterizes the MicroBrew trade dress as "high-tech," a look that "was originally created for electronic devices, such as VCR's, stereos, cameras, calculators, video cameras, dictating equipment, compact disc players, etc." (D.I. 21, Affidavit ["Aff."] of Kevin P. O'Malley, Group Vice President and General Manager of Farberware, at ¶ 10.) According to Farberware, the MicroBrew trade dress is also "unique," "arbitrary," and "has no recognized meaning in the industry except as designating [Farberware] as the source of the product." (D.I. 1 at ¶ 13.)

Farberware alleges in its complaint that Mr. Coffee's microwave coffee maker, called "Quick Brew," uses a trade dress that is "substantially similar" to the MicroBrew trade dress. (*Id.* at ¶ 20.) Farberware then describes the allegedly infringing Quick Brew trade dress using the exact description given to the MicroBrew. (*Id.* at ¶ 21; *see also* D.I. 24, Exhibit 9 [sample Quick Brew].[3])

Farberware alleges one federal and several state claims against Mr. Coffee. (*See* D.I. 1.) The federal count is a trade dress infringement claim which is brought pursuant to section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a) (West Supp.1990). The state claims consist of common law trademark infringement, common law unfair competition, and unjust enrichment.[4]

(*See* D.I. 1 at 8–10.) Farberware seeks relief in the form of a preliminary and permanent injunction that will, among other things, restrain Mr. Coffee from filling any orders for its Quick Brew coffee maker.[5] (*Id.* at 11.) Farberware also seeks compensatory and punitive damages, as well as costs and attorney fees. (*Id.* at 13.)

## DISCUSSION

A trademark, and by analogy a trade dress, "deals with a delicate matter that may be of great value but that is easily destroyed, and therefore should be protected with corresponding care." *A. Bourjois & Company, Inc. v. Katzel*, 260 U.S. 689, 692, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923). As Oliver Wendell Holmes put it, a trademark "stakes the reputation of the plaintiff upon the character of the goods." *Id.* (citation omitted). Injunctive relief is therefore particularly appropriate in meritorious trademark or ·trade dress infringement cases because "[m]onetary damages are likely to be inadequate compensation for such harm." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir.1979) (citation omitted), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

### I. *Preliminary Injunction Standard*

In ruling on a motion for preliminary injunction, a court must consider the moving party's likelihood of success on the merits, the probability of irreparable injury to the moving party in the absence of relief, the balance of the equities, and the public interest. *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d

---

**2.** The Court notes that MicroBrew also contains red elements. However, Farberware does not claim these elements as part of its protectable trade dress.

**3.** The sample Quick Brew submitted by Mr. Coffee as Exhibit 9, D.I. 24, is a prototype. The Quick Brew units that are presently being shipped to customers, *see infra* note 5, differ only slightly from the prototype. The Court has seen one of these units (hereinafter referred to as Exhibit 9–A), and is satisfied that the minute differences between it and the prototype are inconsequential for the purposes of this litigation.

**4.** The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338(a) & (b), and the doctrine of pendent jurisdiction.

**5.** Earlier in this case Farberware also moved, unsuccessfully, for a temporary restraining order. (*See* D.I. 3.) That motion was heard and denied by this Court on April 26, 1990. (*See* D.I. 8 [transcript of TRO hearing] at 9.) According to its counsel, Mr. Coffee began shipping the Quick Brew units to customers on May 17, 1990.

1136, 1140 (3d Cir.1986). The Court will evaluate Farberware's motion for a preliminary injunction in light of these four criteria. Farberware, as plaintiff, obviously bears the burden on this motion. *See A. O. Smith Corp. v. Federal Trade Commission*, 530 F.2d 515, 525 (3d Cir.1976).

## II. *Likelihood of Success on the Merits*

■ Section 43(a) of the Lanham Act creates a civil remedy for the use, in connection with the sale of goods in interstate commerce, of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of ... [one person's] goods, services, or commercial activities by another person...." Trademark Law Revision Act, Pub.L. No. 100–667, § 132, 102 Stat. 3946 (1988) (codified as amending 15 U.S.C. § 1125(a)). This section of the Act protects a product's trade dress, or "overall appearance or design," [6] from unprivileged imitation, which is a form of unfair competition. *See American Greetings Corp.*, 807 F.2d at 1141 n. 2; *see also Barnes Group, Inc. v. Connell Limited Partnership*, No. 89–531–CMW, slip op. at 20 (D.Del. March 7, 1990) (available on WESTLAW at 1990 WL 25049).[7]

## A. *Elements of a Trade Dress Claim*

To make out a claim of trade dress infringement under section 43(a), a plaintiff must demonstrate: (1) that the imitated trade dress, or "overall combination of features," is non-functional; (2) that the trade dress has acquired secondary meaning; and (3) that consumers "are likely to confuse the source of the product bearing the imitating ... combination [of features]

with the source of the product bearing the imitated ... combination." *American Greetings*, 807 F.2d at 1141 (citations omitted).

The Third Circuit has stated that the "essence" of the functionality inquiry "is whether a particular feature of a product ... is substantially related to its value *as a produce...*, *i.e.*, if the feature is part of the 'function' served, or whether the primary value of a particular feature is the identification of the provider." *United States Golf Association v. St. Andrews Systems, Data–Max, Inc.*, 749 F.2d 1028, 1033 (3d Cir.1984) (citations omitted). To be functional and thus not warrant protection, a feature or combination of features must "have a significant relation to the utilitarian function of the product...." *American Greetings*, 807 F.2d at 1142 (citation omitted).

To establish secondary meaning, the second element of trade dress infringement, "a manufacturer must show that, in the minds of the public, the *primary significance* of a product feature or term is to identify the *source of the product* rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982) (citation omitted) (emphasis added). "In determining the existence of secondary meaning the court 'may consider factors such as length of use, buyer association, extent of sales and advertising, and the fact of copying.'" *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir.1984) (citations omitted).

In this case, the Court will not discuss these first two elements of a trade dress claim because, as noted below, it is clear

---

**6.** Historically, trade dress infringement "'consisted of copying a product's packaging....'" *American Greetings Corp.*, 807 F.2d at 1140 (citations omitted). Today, however, trade dress can also refer to the appearance of the product itself. *Id.* "'Trade dress is a complex composite of features' and '[t]he law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately.'" *Id.* at 1141 (citations omitted).

**7.** Section 43(a) of the Lanham Act was recently amended "to codify the interpretation it has been given by the courts." S.Rep. No. 515, 100th Cong., 2d Sess. 40, *reprinted in* 1988 U.S. Code Cong. & Admin.News 5577, 5603 (noting that "violations of trade dress and certain nonfunctional configurations of goods" have been held to be actionable under section 43(a)); *see also U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 921 n. 8 (3d Cir. 1990).

that Farberware cannot make out the third element, a likelihood of confusion. *Cf. American Home Products Corp. v. Barr Laboratories, Inc.,* 834 F.2d 368, 370 (3d Cir.1987). As our Court of Appeals has stated, "The dispositive issue is the possibility of consumer confusion as to source. Regardless of how much secondary meaning it possesses, a product's trade dress will not be protected from an imitator that is sufficiently different in its features to avoid such confusion." *Freixenet,* 731 F.2d at 151 (citation omitted).

## B. Likelihood of Confusion

A court can consider numerous factors in determining whether "members of the consuming public are *likely* to confuse the *source*" of the defendant's product with the source of the plaintiff's product. *American Greetings Corp.,* 807 F.2d at 1141 (emphasis added). Many of the considerations relevant in trade dress cases are present in the ten-factor, "likelihood of confusion" inquiry adopted by the Third Circuit for trademark cases. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978). Thus, courts will often apply the *Scott Paper* standard in trade dress infringement cases. *See, e.g., CPC International, Inc. v. Caribe Food Distributors,* 731 F.Supp. 660, 664–65 (D.N.J.1990).

■ The ten factors deemed relevant in *Scott Paper* are the following:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9)

the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper,* 589 F.2d at 1229 (citations omitted). While a court may consider all of these factors, such a detailed inquiry is not necessary for purposes of evaluating a preliminary injunction motion because some of the factors may be dispositive. *See Freixenet,* 731 F.2d at 152. Accordingly, the Court will first consider the degree of similarity between the Farberware MicroBrew and the Mr. Coffee Quick Brew. The Court will then consider the other *Scott Paper* factors to the extent they are relevant here.

### (1) *Degree of Similarity*

■ The degree of visual similarity between the two products, also referred to as the "subjective eyeball test," *see AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1540 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987), is particularly critical in this case. The Court has examined both the Farberware MicroBrew and the Mr. Coffee Quick Brew. These products simply do not look alike.

At the outset, the Court notes that while Mr. Coffee's product *is,* as alleged by Farberware, matte black with contrasting white lettering, the Farberware MicroBrew is a *three-color* product. In other words, although Farberware's description of its MicroBrew trade dress would lead one to conclude otherwise, *see supra* p. 2, the MicroBrew is not adorned in merely black and white. The MicroBrew also contains red ornamentation. (*See* D.I. 1, Exhibit A [sample MicroBrew]; *see also supra* note 2.) The bottom of the MicroBrew lid consists of a red rubber stripe (or gasket) that is over a quarter of an inch thick. That stripe is designed to be always at least partially visible (even when the lid is on the MicroBrew unit). Indeed, the portion of the red stripe that is always visible is obviously meant to coordinate with the Farberware brand name itself, *which is also in red.* (*See id.*) The color red is therefore a

prominent part of the MicroBrew's appearance.

Despite the significance of the color red, Farberware does not claim the red portions as part of its allegedly protectable trade dress. (*Cf.* D.I. 1 at ¶ 12.) It does claim, however, that the "contrasting white lettering" on MicroBrew is protectable. (*See id.*) The Court notes that white is *only* used in the word "MicroBrew," which is written in mostly lowercase letters and located immediately to the right of the "Farberware" brand name, which itself appears in all capitalized, red letters. Both of these words appear on the front of MicroBrew, approximately a third of the way down from the top of the lid.

Farberware's description of its MicroBrew trade dress is, at best, disingenuous. At worst, the claimed trade dress could be fairly characterized as specifically contrived to fit Farberware's needs in this litigation. There is only one explanation for why Farberware framed its claim for trade dress protection in this case so as to exclude MicroBrew's prominent red accents: Mr. Coffee's Quick Brew does not contain any red elements. (*See* Defendant's Exhibit 9 [sample Quick Brew].) Before this suit was filed, Farberware was involved in a similar trade dress dispute with Nordic Ware, another manufacturer of coffee makers. Nordic Ware planned to introduce a microwave coffee maker made of black transparent plastic with red and white printing. The dispute was settled when "Nordic Ware agreed to *drop the red printing* ...." (D.I. 21, Aff. of Mr. O'Malley at 6 n. 3 [emphasis added].) The red features of MicroBrew are obviously significant to Farberware's allegedly unique, high-tech look.[8]

The Court further finds that, aside from the obvious difference in colored ornamentation, the MicroBrew and Quick Brew vary in other important, visual respects. In *American Home Products Corporation v. Barr Laboratories, Inc.*, 834 F.2d at 371, the Third Circuit identified several facts

that made confusion unlikely, and those facts are particularly relevant in this case. *American Home Products* involved a suit by the manufacturer of brown, 200–milligram ibuprofen tablets packaged under the name "ADVIL." *Id.* at 369. The defendant also manufactured 200–milligram ibuprofen tablets; these were virtually identical in size and color to ADVIL, but sold at half the price. *Id.*

■ The Third Circuit held that the district court had been "plainly correct in finding that there was little chance of confusion...." *Id.* at 371. Among the considerations the court found relevant was the fact that the defendant's packaging was "easily distinguishable" from the plaintiff's. *See id.; cf. Second Earth Enterprises, Inc. v. Allstar Product Marketing Co.*, 717 F.Supp. 302, 308 (E.D.Pa.1989) (products—disposable novelty items—were "nearly identical," but no likelihood of confusion as to source because of clear packaging). In this case, the packaging of the products at issue also militates against confusion. *Cf. Warner Lambert Co. v. McCrory's Corp.*, 718 F.Supp. 389, 398 (D.N.J.1989) ("Of particular importance is the fact that on store shelves Listerine can be readily distinguished from McCrory's house brand because Listerine is sold in a distinctive overwrap."). The Court credits the observations of Mr. Coffee's marketing vice president, observations which coincide with the Court's own visual impressions:

> The Quick Brew will be sold in a conventional square box, printed in a grey and red background. The packaging embodies the Mr. Coffee [or] Quick Brew logos on five of the six panels of the box.
>
> \* \* \* \* \* \*
>
> The MicroBrew packaging is sleek and in the unconventional shape of a hexagon. It has a glossy off-white background with photographic images of the MicroBrew standing in front of a microwave

---

8. The numerous editorial comments generated by Farberware's promotion campaign almost uniformly refer to the MicroBrew as being "black and red-trimmed." (*See, e.g.,* D.I. 21, Exhibit E–1 [numerous newspaper and magazine articles describing MicroBrew].) This is further evidence of the significance of MicroBrew's red elements.

oven alongside two coffee cups in a sea of coffee beans.

(D.I. 28, Aff. of J.K. Duncan, Marketing Vice President for Mr. Coffee, at ¶¶ 51–52.) [9]

■ Confusion is unlikely not only when the packaging is distinctive, but also when a product is prominently labeled. *See, e.g., Freixenet,* 731 F.2d at 151–52 (bottle labels too dissimilar to support a finding of confusion); *Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y. 1979) (confusion unlikely when manufacturer name clearly displayed). In this case, the products themselves, as well as their packages, are clearly labeled with their respective product names and the names of their manufacturers.[10]

Another factor the *American Home Products* Court found relevant was that the two ibuprofen tablets, although of identical color and size, differed in other important, physical respects. *See* 834 F.2d at 371. The ADVIL tablet's brown was glossy, while the defendant's brown was dull. *Id.* at 369. The word "Advil" was printed on the plaintiff's tablet in small, black letters, while the only marking on defendant's tablet was "I–2," which was impressed into the tablet's surface in relatively large characters. *Id.* Finally, although the tablets were the same size their shape was somewhat different. *Id.*

Farberware has put much emphasis on the "distinctive shape or silhouette" of its MicroBrew. (*See, e.g.,* D.I. 21, Aff. of Kev-

in P. O'Malley at ¶¶ 6, 16.) As Mr. Coffee points out, however, that "distinctive shape" differs sharply from Quick Brew's shape. The Farberware MicroBrew is cylindrical with two handles, topped by a lid that fits both the reservoir portion at the top of the product and the lower, carafe portion. (*Id.* at ¶ 5.) The Mr. Coffee Quick Brew is also cylindrical with two handles, but its lid is much wider in diameter than the product's lower, mug portion.

The Court agrees with Mr. Coffee's description of the visual differences: "[T]he Quick Brew gives the appearance of a tall, slender, tubular shape with distinct conical top ... The MicroBrew, in contrast, is of a squat black cylindrical shape." (D.I. 28, Aff. of Mr. Duncan at ¶¶ 3–4.) Quick Brew looks significantly thinner and taller than MicroBrew, and, as emphasized by Mr. Coffee, it flairs into a cone shape at the top.

Moreover, as was true in *American Products,* 834 F.2d at 371, the markings on both items here are different. Unlike MicroBrew, Quick Brew contains no red elements and no diagonal ornamental slashes. What Quick Brew does contain is glossy black stripes circling its lower, mug portion and its conical top. Finally, the brand names, prominently displayed on both products, are located on different parts of the coffee makers and are printed in different type styles and sizes.

### (2) *Other Factors Relevant to Confusion*

■ One of the factors noted in *Scott Paper* as relevant to the likelihood of con-

---

**9.** Farberware concedes, as it must, that its packaging differs from Mr. Coffee's. (*See* D.I. 21, Aff. of Mr. O'Malley at ¶ 29.) It maintains, however, that the "difference in packaging is irrelevant" because when its "customers sell the product, they normally place units outside of the box on display to the consumers." (*Id.*) The Court understands this statement to mean that although the MicroBrew hexagonal-shaped packaging will usually be on display or visible on retail floors, the MicroBrew units themselves will also be on display outside the packaging. Given the prelitigation statements made by Mr. O'Malley (*see* D.I. 28, Exhibit M [article dated April 24, 1989, in which Mr. O'Malley comments that the "packaging, designed to encourage gift purchases, will make an impact on the retail floor ..."]), this is the only reading of Mr. O'Malley's affidavit that would make sense.

Mr. O'Malley's statement is thus nothing more than an opinion that the presence of the packaging, alongside the unit itself, would not limit the alleged confusion. The Court rejects this proposition and finds that the difference in packaging is a factor that is relevant to the extent indicated in the text of this Opinion.

**10.** Farberware argues that having the "Mr. Coffee" logo on the front of the Quick Brew is insufficient to prevent confusion or association with Farberware or Farberware's MicroBrew. (*See* D.I. 20 at 69.) It is true that even clearly labeled goods could confuse consumers if other factors, such as those discussed in *Scott Paper,* 589 F.2d at 1229, are present, or if the products are otherwise very similar. Here, however, the numerous visual differences, coupled with the clear labeling and packaging, make confusion unlikely.

fusion inquiry is the defendant's intent. *See* 589 F.2d at 1229. Courts have held that if the defendant consciously imitates the plaintiff's trade dress, a presumption arises that the similarity will cause customer confusion. *Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.,* 680 F.2d 891, 893 (2d Cir.1982). Farberware naturally invokes this presumption in connection with its argument that Mr. Coffee intentionally imitated the MicroBrew trade dress. (*See* D.I. 20 at 57–59.) This "presumption," however, does not help Farberware in this case. In this Circuit, the plaintiff must prove a likelihood of confusion *despite* any evidence of the defendant's intent. "Although intent to confuse might be highly probative of likelihood of confusion, [it is not error for a court to] ... declin[e] to infer likelihood of consumer confusion from a mere intent to imitate." *American Home Products Corp.,* 834 F.2d at 371 (citation omitted); *see also CPC International,* 731 F.Supp. at 668.

■ Farberware essentially makes two arguments to support its contention that Mr. Coffee intended to imitate. First, Farberware points to what it characterizes as design errors in the MicroBrew, and then argues that Mr. Coffee made the same errors in the Quick Brew because it was imitating the Farberware design. The Court rejects this argument. The design elements in question may have been unfortunate from Farberware's perspective, but there is no reason to assume (at least at this point) that Mr. Coffee's design decisions were also errors. For example, Farberware contends that one of the "mistakes" it made was making the MicroBrew carafe plastic instead of glass. (*See* D.I. 21, Aff. of Mr. O'Malley at 18.) Another mistake was designing the MicroBrew to make a maximum of ten ounces of coffee when the carafe is large enough to hold over 25 ounces. (*See id.* at 17.) The alleged counterparts of these MicroBrew "flaws" are in reality design elements that

are crucial to the success of Mr. Coffee's Quick Brew, which boasts in its advertisements not a "carafe" (*see id.*) but a "travel mug" with a "snap-on, spill-proof lid" meant to be used by consumers on their commute to work. (*See* D.I. 28, Aff. of Mr. Duncan at ¶¶ 53, 54; *see also* D.I. 28, Exhibit U [sample of planned Quick Brew advertisement].) The ten ounces of coffee that "get lost" in the MicroBrew's 25-ounce carafe fit quite well in the Quick Brew's travel mug, which is significantly smaller in diameter than the MicroBrew carafe.

■ Farberware's second argument regarding Mr. Coffee's alleged intent to imitate focuses on the circumstances surrounding the development of the allegedly infringing Quick Brew trade dress. Specifically, Farberware underscores the fact that Mr. Coffee was aware of the Micro-Brew trade dress when it developed its Quick Brew trade dress.[11] Mr. Coffee concedes that it provided its product designer with a sample MicroBrew. But it contends "[i]t is *standard practice* to make available to product designers other products which compete in the same category as your own product ... [to] *avoid* [ ] the potential for inadvertent copying or borrowing of a competitor's design." (D.I. 28, Aff. of Mr. Duncan at 8 n. * [emphasis added]; *accord* D.I. 30, Aff. of William Bartasevich, Quick Brew designer, at ¶ 5.) Accordingly, Mr. Coffee points out that its product designer was also given a sample Gemco product (a percolator-type microwave coffee maker). (*See* D.I. 28, Aff. of Mr. Duncan at 8 n. *.)

If it is in fact "standard practice" in the coffee maker industry to provide product designers with samples of competing products, then that Mr. Coffee did so would be less significant, especially given the numerous visual differences the Court has already described between MicroBrew and the resulting Mr. Coffee product. The Court notes that Farberware has not yet

---

**11.** According to Farberware, MicroBrew was first sold and shipped in May of 1989, with the first "large scale shipments" not being made until August or September of that year. (*See* D.I. 21, Aff. of Mr. O'Malley at ¶ 16.) Quick Brew was designed in the fall of 1989 (*see* D.I. 28, Aff. of Mr. Duncan at ¶¶ 14, 16), and Mr. Coffee began promoting it in January of 1990, in anticipation of a May 15, 1990 distribution date. (*Id.* at ¶ 20.)

contradicted this assertion of a standard industry practice. In fact, Farberware has, at least to some an extent, supported it.[12]

■ Having reviewed the various product designs produced for Mr. Coffee (*see* D.I. 20, Appendix I & II), and having considered the parties' arguments on this issue, the Court finds that it cannot conclude at this point in time that Mr. Coffee intended to imitate MicroBrew's trade dress. Farberware has submitted persuasive evidence on this issue; but Mr. Coffee's arguments are at least equally compelling.[13]

■ Another one of the *Scott Paper* factors is whether there is any evidence of *actual* confusion. In this case, the plaintiff has not presented evidence of actual confusion. Farberware correctly argues, however, that it need not proffer any such evidence in order to support a finding that consumer confusion is likely, *see, e.g., John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir.1983), although obviously such evidence is highly probative. Farberware also rightly disputes, at least at this point in time, the significance of the lack of any evidence of actual confusion given the fact that Mr. Coffee has only just recently begun shipping Quick Brew to retailers. In light of these facts, the Court will not at this point draw any negative inferences because of the lack of evidence of actual confusion.

■ The Court now turns to two of the other *Scott Paper* criteria, both of which relate to whether the allegedly imitating product has the potential to compete with the allegedly imitated product. *Cf. Scott Paper*, 589 F.2d at 1229 (noting as relevant factors [1] whether the goods, though not competing, are marketed and advertised through the same channels of trade, and [2] whether the parties' sales targets are the same). Mr. Coffee has emphasized that Farberware targets "upscale" consumers and "upscale" retailers via television advertising, while Mr. Coffee targets, via radio advertisements, a "more modest" consumer, who shops in stores such as Wal–Mart. The Court rejects this argument. As Farberware puts it, "There can be no question that Quick Brew competes with MicroBrew for the same customers." (D.I. 21, Aff. of Mr. O'Malley at ¶ 35.) Both products are exhibited at the same trade shows,[14] and sold to the same potential retailers, although the percentages of sales to each category of retailer

---

**12.** In planning its design for a *new*, drip-type microwave coffee maker which it is currently developing, Farberware conducted a consumer survey that compared its MicroBrew to a picture of the Mr. Coffee Quick Brew. (*See* D.I. 21, Aff. of Mr. O'Malley at ¶¶ 21–22.)

**13.** For example, the very first Quick Brew prototype—which is *not* Exhibit 9, D.I. 24, the version discussed throughout this Opinion—was virtually identical in size to the Farberware Micro-Brew. (*See* D.I. 22, Deposition of Stanley Grzywna, Project Engineer for Mr. Coffee, at 23.) However, the subsequent Quick Brew prototype was approximately three quarters of an inch taller than the 6.7–inch MicroBrew. (*Id.* at 24; *see also* Exhibit 9, D.I. 24.) This change in height preceded any dispute between Farberware and Mr. Coffee. The version of the Quick Brew which is currently on sale is, like the second prototype, three quarters of an inch taller than the MicroBrew. (*See* Exhibit 9–A; *see also supra* note 3.)

Although one could argue that in reality three quarters of an inch is an unimportant difference, the fact is that these products are designed in such a way that Quick Brew appears to be significantly taller than MicroBrew. *See supra* p. 299. Moreover, it is not particularly important that both products are of a relatively similar size since, as Farberware points out, the height of a microwave coffee maker is necessarily "circumscribed by the cavities of existing microwave ovens." (D.I. 28, Aff. of Mr. Duncan at ¶ 45.) On the other hand, the fact that the initial Quick Brew prototype was virtually identical in size to the MicroBrew could be strong evidence of intentional copying.

Nevertheless, after reviewing the various designs considered by Mr. Coffee, and because of the other significant, visual differences that have all along existed between the various Quick Brew models and MicroBrew, the Court concludes that at most Mr. Coffee could be said to have intentionally copied the *height* of Micro-Brew. This is a feature, however, that Farberware does not claim as part of its protected trade dress. Further, as noted above, the current Quick Brew is actually somewhat taller than MicroBrew and appears, because of its design, to be significantly taller. Hence, the Court finds that, overall, this factor does not weigh in favor of a finding that confusion is likely.

**14.** Mr. Coffee itself emphasized this point. (*Cf.* D.I. 28, Aff. of Mr. Duncan at 10–14.)

do differ. (*Id.; see also* D.I. 27 at 74 n. *.) The alleged difference in advertising methods is not particularly significant in this case given that the same customers are targeted. Moreover, both products will be advertised through print advertising, and are already discussed in the same context in trade publications. (*See, e.g.,* D.I. 24, Exhibit DX 1 [discussing the Farberware, Nordic Ware, and Mr. Coffee microwave coffee makers].) This factor therefore weighs in favor of a finding of a likelihood of confusion.[15]

In sum, some of the aforementioned factors make confusion unlikely, and some indicate the opposite. Viewing all of the facts and *Scott Paper* criteria discussed *together*, the Court must conclude that confusion is not likely. This is especially true given the strong visual differences between the Quick Brew and MicroBrew. *See supra* pp. 297–299.

### (3) *Subliminal Confusion*

■ Farberware makes an interesting argument that focuses on the alleged possibility of *subliminal* confusion which could lead consumers to believe that Farberware was somehow associated or affiliated with Mr. Coffee's Quick Brew. Subliminal confusion causes "the consumer to identify the properties and reputation of one product with those of another, *although he can identify the particular manufacturer of each.*" *Ortho Pharmaceutical Corp. v. American Cyanamid Co.,* 361 F.Supp. 1032, 1044 (D.N.J.1973) (Garth, J.). The

Court has considered this argument carefully, particularly in light of the Trademark Law Revision Act's language, which makes actionable the use of any symbol or device which is likely to cause confusion (1) "as to the affiliation, connection, or association . . ." of one manufacturer with another, or (2) "as to the origin, sponsorship, or approval" of one manufacturer's goods by another manufacturer. *See* 15 U.S.C. § 1125(a)(1). The Court finds, however, that the subliminal confusion argument does not help Farberware in this case.

Each of the cases cited by Farberware to support its subliminal confusion argument is a trademark (and not trade dress) infringement case in which the defendant adopted a mark that was decidely *similar* to the mark that was found to be infringed through subliminal association. *See, e.g., Ortho Pharmaceutical,* 361 F.Supp. at 1039 ("RhoGAM" vs. "Rho–Imune"); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1340 (2d Cir.1975) ("Steinway" vs. "Grotrian–Steinweg"); *Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1300–01 (E.D.Pa.1987) ("Carnival" & "Carnival Cruise Lines" vs. "Carnival Club and Design"); *Trump v. Caesars World, Inc.,* 645 F.Supp. 1015, 1023 (D.N.J.1986) ("The Palace" & "Caesars Palace" vs. "Trump's Palace"), *aff'd without opinion,* 819 F.2d 1135 (3d Cir.1987); *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 428 (S.D.

---

**15.** Although the fact that Mr. Coffee's product is meant to appeal to modest consumers, while Farberware's is directed to the more upscale, does not negate that these products compete, it does lead the Court to consider another relevant factor, namely the price differential. *Cf. Scott Paper,* 589 F.2d 1229. According to Farberware, the initial wholesale price of the MicroBrew was $22.00. (D.I. 21 at ¶ 31.) The suggested retail price of MicroBrew has varied somewhat, but it has clearly been as high as $39.95. (*See, e.g.,* D.I. 21, Exhibit E–2; D.I. 28, Exhibit S.) Numerous retail advertisements produced by both parties reveal that MicroBrew retailers have also routinely sold the product for a price in the range of $24.99 to $30.00. (*See, e.g.,* D.I. 21, Exhibit E–2.) The wholesale prices have dropped from the initial $22.00 to something in the range of $16.00 to $20.00. (*Cf.* D.I. 21, Aff. of Mr. O'Malley at ¶ 31.)

Despite these fluctuations in price, it is clear that MicroBrew has always been significantly more expensive than Quick Brew, which sells at a retail price of $10.00 to $14.00 (*see* D.I. 28, Aff. of Mr. Duncan at ¶ 58), and a wholesale price in the $8.00 range. (*See* D.I. 21, Aff. of Mr. O'Malley at ¶ 30.) Indeed, this price differential was the subject of some comment by the trade press (*see, e.g.,* D.I. 28, Exhibit F [article noting that Quick Brew's suggested retail price is $14.99, compared to MicroBrew's $30.00] ), and the vice president of Farberware himself has stated that "[n]o intelligent retailer would carry both MicroBrew and Quick Brew together in view of their *radically different price points.*" (D.I. 21, Aff. of Mr. O'Malley at ¶ 28 [emphasis added].) The Court concludes that this difference in price points is another factor that tends to make confusion unlikely.

N.Y.1980) ("Playboy" vs. "Playmen"). Farberware is not complaining in this case of any possible similarity between the product names "MicroBrew" and "Quick Brew." (*See* D.I. 1.) Rather, this action is for alleged infringement of MicroBrew's *trade dress*, and the Court has already detailed how *not* similar the MicroBrew and Quick Brew trade dresses are.

The Court is cognizant of the fact that likelihood of confusion is not measured by " 'whether the products can be differentiated when subjected to a side-by-side comparison, but rather whether they create the same general overall impression.' " *Paco Rabanne*, 680 F.2d at 893 (citation omitted). Hence, "[i]n comparing the degree to which trade dresses are similar, ... the test to be applied is whether after looking at the visual similarity of the packages when viewed as a whole, and not by attention to individual features, one is left with the impression that a consumer would not be able to distinguish a defendant's product from a plaintiff's product if he or she saw the latter alone." *Knorr–Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F.Supp. 787, 793–94 (D.N.J.1988) (citation omitted).

Applying this standard, the Court finds that Quick Brew and MicroBrew do not convey the same impression. In fact, the two products in this case look nothing alike. Given this difference in overall appearance or, in Farberware's words, "gestalt," and that other relevant factors militate against any possible confusion, *see supra* pp. 299–302, the Court believes that there is no danger that subliminal confusion would cause consumers to believe that Farberware and Mr. Coffee are affiliated or that the Mr. Coffee Quick Brew has Farberware's approval.

For the reasons stated, the Court finds that Farberware has not shown the requisite likelihood of confusion. Accordingly, it has also not shown that it is likely to succeed on the merits of its trade dress claim.

**16.** In light of this outcome, the Court need not address Mr. Coffee's argument that Farber-

### III. *Irreparable Harm*

Although Farberware has not shown that it is likely to succeed on the merits, the Court will also examine its case on the other preliminary injunction criteria. The second of these is irreparable injury. Irreparable injury means "irreparable—not merely serious or substantial." *A.O. Smith Corp.*, 530 F.2d at 525. That is, " 'the injury must be of a peculiar nature, so that compensation in money cannot atone for it....' " *Id.* (citation omitted). An injury is also considered irreparable " 'where money damages are difficult to ascertain....' " *Id.* (citation omitted).

Certain courts have held in the trademark/trade dress context that irreparable injury is to be *presumed* in cases in which the allegedly infringed plaintiffs show the requisite likelihood of success on the merits. *See, e.g., Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir.1989); *Paco Rabanne*, 680 F.2d at 893–94; *Gardner Bender*, 612 F.2d at 1025–26; *Warner Lambert*, 718 F.Supp. at 393. "This readiness to find irreparable injury arises, in part, from the realization 'that the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods.' " *Gardner Bender*, 612 F.2d at 1026 (citation omitted). Courts have thus reasoned that the probability of confusion brought about by the allegedly infringing good is sufficient to establish that a plaintiff is likely to suffer irreparable harm to its reputation and good will, *see Paco Rabanne*, 680 F.2d at 894, and, accordingly, a plaintiff need not prove any "actual diversion of sales." *Tootsie Roll Industries, Inc. v. Sathers, Inc.*, 666 F.Supp. 655, 661 (D.Del.1987) (citation omitted).

In this case, however, the Court has already concluded that Farberware failed to show any likelihood of consumer confusion. Consequently, the Court cannot presume that, absent the preliminary injunction requested, Farberware would probably suffer irreparable injury.[16]

ware's alleged four-month delay in seeking pre-

## IV. *Balance of the Equities*

The third issue that is relevant to a preliminary injunction analysis is the balance of the equities. That is, "a court should consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it." *Warner Lambert*, 718 F.Supp. at 399 (citing *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985)).

One important consideration compels this Court to conclude that granting a preliminary injunction against distribution of the Quick Brew would be particularly harmful to Mr. Coffee: Farberware is poised to introduce a new microwave coffee maker that has been specifically developed to counter numerous Quick Brew features that apparently cause consumers to prefer it to the Farberware MicroBrew. (*See generally* D.I. 27, Appendix 1 [Farberware marketing research report entitled *Strategic Research into Countering the Launch of Mr. Coffee Quick Brew*]; D.I. 21, Exhibit H [photograph of Farberware's new product].) Enjoining Quick Brew sales at this stage would thus give Farberware a significant advantage, and deprive Mr. Coffee of being first out on the market with its travel mug concept. (*See* D.I. 28, Aff. of Mr. Duncan at ¶ 63.)

## V. *Public Interest*

There are two public interest factors that are typically of concern in evaluating preliminary injunction motions in cases of alleged trademark or trade dress infringement:

First, the public has an interest in protecting business good will. Second, there is a public interest in fostering open and fair competition. The former allows consumers to garner a degree of knowledge about products in the market and fosters a sense that they "know what they are getting" when they buy a product ... The latter is obviously a central feature of our economic system.

*Tootsie Roll Industries*, 666 F.Supp. at 661 (citation omitted).

In this case, the Court has already concluded that confusion is unlikely. Consequently, for several reasons the Court finds that the public interest weighs at least slightly in favor of competition. First, the microwave coffee maker market is relatively new. Although the parties in this case have pointed out that at least one new microwave coffee maker appears to have entered the market since the start of this litigation, consumers wishing to purchase a microwave coffee maker certainly do not enjoy the vast range of product choices available in the traditional coffee maker market. Thus, enjoining sales of the Mr. Coffee Quick Brew *pendente lite* would deprive consumers of one of the few available alternatives. Second, the Quick Brew is a less expensive alternative to the MicroBrew. *Cf. Warner Lambert*, 718 F.Supp. at 399 (public interest best served by allowing sale of the lower priced, allegedly infringing product). Third, given that about 50 percent of all Americans drink coffee and that 80 percent of the households in this country are equipped with microwave ovens (*see* D.I. 21, Exhibit E–1 [*New York Times* article dated May 27, 1989]), the Court concludes that a considerable number of consumers could conceivably be affected.

## CONCLUSION

Farberware has not shown the requisite likelihood of success on the merits of its trade dress infringement claim. Farberware has also not shown that it will suffer irreparable harm if Mr. Coffee is not enjoined *pendente lite*. Moreover, the balance of the equities in this case and the public interest (to the extent it is implicated) militate against issuance of an injunction. Farberware's motion for a prelimi-

liminary relief belies its claim of irreparable harm.

nary injunction will therefore be denied.[17] An appropriate order follows.

---

**17.** Farberware did not premise its motion for preliminary injunction on any of the state claims noted in its complaint. (*Cf.* D.I. 20; D.I. 32 [transcript of preliminary injunction hearing].) Hence, these claims will not be addressed here. The Court does note, however, that, given the disposition of the federal trade dress claim in this Opinion, it seems reasonably clear that Farberware would not have been entitled to a preliminary injunction based on any of its state claims because Delaware law requires a showing not unlike the federal standard discussed above. *See Draper Communications, Inc. v. Delaware Valley Broadcasters Limited Partnership,* 505 A.2d 1283, 1289–90 (Del.Ch.1985); *Air Reduction Co. v. Airco Supply Co.,* 258 A.2d 302, 306 (Del.Ch.1969); *cf. Denstply International, Inc. v. Kerr Mfg. Co.,* 732 F.Supp. 482, 488–89 (D.Del.1990).