THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: December 21, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

‗‗‗‗

Trademark Trial and Appeal Board

‗‗‗‗

*In re SnoWizard, Inc.*

‗‗‗‗

Serial No. 87134847

‗‗‗‗

Kenneth L. Tolar of Tolar Harrigan & Morris LLC,
    for SnoWizard, Inc.

Carol Spils, Trademark Examining Attorney, Law Office 104,
    Zachary Cromer, Managing Attorney.

‗‗‗‗

Before Zervas, Ritchie, and Pologeorgis,
    Administrative Trademark Judges.

Opinion by Pologeorgis, Administrative Trademark Judge:

SnoWizard, Inc. ("Applicant") seeks registration on the Principal Register under

Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), of the asserted mark, as

displayed below, for goods identified as "Concession trailer for snowball vendors to

operate a viable snowball business" in International Class 12.[1]

---

[1] Application Serial No. 87134847 was filed on August 11, 2016, based upon Applicant's
allegation of use in commerce under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a),
claiming February 19, 2009 as both the date of first use and the date of first use in commerce.



Applicant disclaimed the exclusive right to use the term SNOBALLS. Color is not claimed as a feature of the mark. The description of the asserted mark reads as follows:

> The mark consists of a three-dimensional configuration of a snow-capped roof with the word "SNOBALLS", a snowball and associated beverage container positioned on top of a concession trailer for snowball vendors. The matter shown in broken or dotted lines is not part of the mark and serves only to show the position or placement of the mark.

The specimen of record consists of the following photograph of Applicant's asserted mark used in connection with Applicant's identified goods:



The Examining Attorney refused registration under Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§ 1051-52 and 1127, on the ground that Applicant's applied-for mark consists of a non-distinctive product design that does not function as a trademark and has not acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).

When the refusal was made final, Applicant appealed. The appeal is fully briefed.[2] We affirm the refusal to register.

## I. Product Design vs. Product Packaging

By seeking registration under Section 2(f) of the Trademark Act, Applicant has effectively conceded that its asserted mark is not inherently distinctive. *See In re MGA Entm't, Inc.*, 84 USPQ2d 1743, 1747 (TTAB 2007) (application under Section 2(f) is a concession that the asserted mark is not inherently distinctive). Nonetheless Applicant argues that its applied-for mark constitutes product packaging, not product

---

[2] Applicant argues that the Examining Attorney erroneously concluded that Applicant's asserted mark is functional and, therefore, could never be inherently distinctive. *See* Applicant's Appeal Brief, pp. 3-6; 4 TTABVUE 7-10. The Examining Attorney, however, did not refuse registration based on functionality under Section 2(e)(5) of the Trademark Act, 15 U.S.C. § 1052(e)(5). Instead, the refusal is solely based on the ground that Applicant's applied-for mark is a non-distinctive product design that has not acquired distinctiveness. Accordingly, Applicant's arguments on the issue of functionality are given no further consideration.

The TTABVUE and Trademark Status and Document Retrieval ("TSDR") citations refer to the docket and electronic file database for the involved application. All citations to the TSDR database are to the downloadable .PDF version of the documents.

design, so a showing of acquired distinctiveness is not required.[3] Specifically, Applicant argues as follows:

> The claimed design is clearly product packaging as opposed to product design and, therefore, can be, and is inherently distinctive. The uniquely shaped trailer is a stand from which end products (snowballs) are sold, not a design of the product being sold. To conclude otherwise would prevent all trade dress from ever being considered "packaging"; for example, the unique configuration [of] a coca-cola bottle, which is clearly product packaging, does not become product design merely because the bottle might be manufactured by another entity and sold to Coca Cola. Coca Cola purchases the bottle, fills it with its beverage and sells the product to a consumer; the bottle is packaging for the beverage. The identical scenario applies here. SnoWizard manufactures and sells the uniquely designed trailer to snowball vendors who equip the trailer with all supplies necessary to operate a snowball business, and then sell snowballs therefrom. The trailer design is clearly packaging for a snowball sold by snowball vendors.[4]

Whether a mark constitutes product design or product packaging is an important distinction because product design marks can never be inherently distinctive, whereas product packaging marks can be inherently distinctive. *Wal-Mart Stores Inc. v. Samara Bros Inc.,* 529 U.S. 205, 54 USPQ2d 1065, 1069 (2000) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 23 USPQ2d 1081 (1992)). Not all asserted product packaging marks, however, are inherently distinctive. Product packaging that is not inherently distinctive may acquire distinctiveness and thus function as a mark "if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product."

---

[3] Because Applicant advanced this argument throughout prosecution and briefing, we consider this argument as preserving Applicant's position, in the alternative, that Applicant's applied-for mark is product packaging and is inherently distinctive.

[4] Applicant's Appeal Brief, pp. 6-7; 4 TTABVUE 10-11.

*Id*. at 1068 (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ1, 4 n.11 (1982)).

Product design consists of some or all of the design elements of the product itself such as its size, shape, coloring or color combinations, while product packaging consists of some or all of the elements of the packaging or labeling of a product. *Id*. at 1069. And importantly, the goods relevant to our analysis are the goods identified in the application, i.e., a "[c]oncession trailer for snowball vendors to operate a viable snowball business."

Keeping these principles in mind, we fail to see how Applicant's asserted mark, composed of physical aspects of its concession trailers, constitutes product packaging, when the mark consists of the configuration of the roof of its products, the concession trailers, and the word SNOBALLS. The snow-capped roof, the wording SNOBALLS, and the snowball and associated beverage container are integral parts of the configuration of the concession trailer itself and thus are part of the product's design and are not product packaging. The U.S. Supreme Court stated in *Wal-Mart Stores* that in close cases, "courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning," *see id*. at 1070, but this is not a close case. Clearly, the product at issue in this case is the concession trailer; that is the product offered for sale, purchased by, and used by snowball vendors. It is not a container for flavored shaved ice or snowballs sold to consumers, as suggested by Applicant. Accordingly, Applicant's applied-for mark is properly characterized as a product design. Specifically, it is the design of the roof of a

concession trailer. It therefore requires a showing of acquired distinctiveness in order to be registered on the Principal Register.

We further note that Applicant at times characterizes its asserted mark as trade dress, in an apparent attempt to draw a distinction between trade dress and product design. Courts, however, have used the terms "trade dress" and "product design" interchangeably for product features to which trademark rights are claimed.[5] *See e.g.*, *Converse, Inc. v. Int'l Trade Comm'n*, 907 F.3d 1361, 128 USPQ2d 1538 (Fed. Cir. 2018) (a product's design is considered distinctive, and therefore protectable as "trade dress," only upon a showing of secondary meaning); *LeSportsac, Inc. v. K mart Corp.*, 754 F.2d 71, 225 USPQ 654 (2nd Cir. 1985) (design of lightweight nylon luggage protected as "trade dress"); *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 32 USPQ2d 1724, 1729 (3rd Cir. 1994) ("[T]rade dress protection extends beyond a product's packaging or labeling to include 'the appearance of the [product] itself."); *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 228 USPQ 705 (4th Cir. 1986) (defendant's video game console, art work and mark found to be an

---

[5] While "trade dress" historically has been more often used to refer only to the packaging and labeling of a product, the breadth of the term has been expanded to include the shape and design of a product itself. *See, e.g.*, *Elmer v. ICC Fabricating*, 67 F.3d 1571, 36 USPQ2d 1417, 1421-22 (Fed. Cir. 1995) (trade dress refers to product packaging and the design of the product itself); *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 216 USPQ 102, 104 n.2 (3rd Cir. 1982) ("Although historically trade dress infringement consisted of copying a product's packaging, the parties and the district court used the term 'trade dress' in its more modern sense to refer to the appearance of the Rubik's Cube itself as well as its packaging, and we will do the same."); *Kohler Co. v. Moen Inc.*, 12 F.3d 632, 29 USPQ2d 1241, 1248 n.11 (7th Cir. 1993) ("This broad definition of trade dress as applied by the courts includes product configurations."); *Faberware, Inc. v. Mr. Coffee, Inc.*, 740 F. Supp. 291, 16 USPQ2d 1103, 1106 n.6 (D. Del. 1990) ("Today, however, trade dress can also refer to the appearance of the product itself.").

infringement of plaintiff's "trade dress"); *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 34 USPQ2d 1428 (8th Cir. 1995) (design of personal planner was found to be protectable as "trade dress"); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 4 USPQ2d 1497 (10th Cir. 1987) (design of fishing reel was "trade dress"); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 16, comment a (AM. LAW INST. 1995) ("The design features of the product itself are also sometimes included within the meaning of 'trade dress' although the substantive rules applicable to the protection of product designs differ in some respects from those applicable to packaging and related matter."). Thus, whether Applicant's claimed mark for the identified goods is referred to as product design or trade dress is of no consequence. Moreover, the fact that Applicant's asserted mark also includes a word, i.e., SNOBALLS, does not detract from our characterization of Applicant's asserted mark as product design/trade dress, particularly since the wording is at best highly descriptive of the identified goods and has been appropriately disclaimed.[6]

## II. Acquired Distinctiveness of Product Design

As noted earlier, Applicant effectively admits that its asserted mark is not inherently distinctive by seeking registration under Section 2(f). *In re MGA Entm't,*

---

[6] We take judicial notice of the dictionary definition of the term "snowball," the phonetic equivalent of the singular version of the literal portion of Applicant's asserted composite mark, which is defined as "a confection of crushed ice, usually in the shape of a ball, which is flavored with fruit or other syrup and served in a paper cup." *See* Entry for "snowball" from www.dictionary.com, based on the Random House Unabridged Dictionary (2018). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016).

*Inc.*, 84 USPQ2d at 1747. The issue before us, therefore, is whether Applicant has overcome the refusal of its applied-for mark as non-distinctive product design by making a prima facie showing that relevant consumers perceive the design of a snow-capped roof featuring the word SNOBALL[7] and the design of a snowball and associated beverage container, all positioned on top of a concession trailer, as a trademark for such trailers. "The applicant … bears the burden of proving acquired distinctiveness." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015) (citing *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420 (Fed. Cir. 2005)); *In re Hollywood Brands, Inc.,* 214 F.2d 139, 102 USPQ 294, 295 (CCPA 1954) ("There is no doubt that Congress intended that the burden of proof [under Section 2(f)] should rest upon the applicant ...."). Whether acquired distinctiveness has been established is a question of fact. *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1375 (Fed. Cir. 2012).

Although a product design or, as in this case, the design of a portion of a product, "is not inherently distinctive," a product design that provides no real utilitarian advantages to the user, but is one of many equally feasible, efficient and competitive designs, may be registrable upon a showing of acquired distinctiveness pursuant to Section 2(f) of the Trademark Act. *See In re Slokevage*, 441 F.3d 957, 78 USPQ2d 1395, 1398 (Fed. Cir. 2006). The kind and amount of evidence necessary to establish that a proposed mark has acquired distinctiveness in relation to goods or services

---

[7] Though disclaimed, the wording is claimed to be part of the composite mark sought to be registered. Therefore, its impact on the perception of purchasers of concession trailers must be considered in our assessment of the asserted mark as a whole.

depends on the nature of the matter and the circumstances surrounding a mark's use in each case. *Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988); *Roux Labs., Inc. v. Clairol Inc.*, 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970); *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381, 383 (CCPA 1960).

In cases of product design, the evidence provided to establish acquired distinctiveness must relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general. *See Inwood Labs., Inc.*, 214 USPQ at 4 n.11 ("To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."); *In re McIlhenny Co.*, 278 F.2d 953, 126 USPQ 138, 140-41 (CCPA 1960) (promotion of a bottle design bearing other trademarks insufficient under Section 2(f) to show that the public views the bottle design alone as a trademark). *Cf. In re Chem. Dynamics, Inc.*, 839 F.2d 1569, 5 USPQ2d 1828, 1830 (Fed. Cir. 1988) (5 years' use of composite mark does not speak to the issue of whether a component is viewed by itself as a mark); *In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975) (advertising of a design along with word marks lacked the "nexus" that would tie together use of the design and the public's perception of the design as an indicator of source).

Ultimately, to establish acquired distinctiveness, an applicant must demonstrate that the product design sought to be registered is perceived by relevant consumers

not just as the product (or a feature of the product), but as identifying the producer or source of the product. *Wal-Mart*, 54 USPQ2d at 1068 (acquired distinctiveness exists "when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself") (citation and internal quotation marks omitted); *see also Stuart Spector Designs Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1554 (TTAB 2009) ("An applicant must show that the primary significance of the product configuration in the minds of consumers is not the product but the source of that product in order to establish acquired distinctiveness."). This may be shown by direct or circumstantial evidence. *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 128 USPQ2d 1739, 1743 (Fed. Cir. 2018) ("The Board and courts have recognized that both direct and circumstantial evidence may show secondary meaning.") (citation omitted); *In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1283 (TTAB 2000). Direct evidence includes actual testimony, declarations or surveys of consumers as to their state of mind. *Ennco Display Sys.*, 56 USPQ2d at 1283. Circumstantial evidence, on the other hand, is evidence from which consumer association might be inferred, such as years of use, prior registrations, extensive amount of sales and advertising, unsolicited media coverage, and any similar evidence showing wide exposure of the mark to consumers. *Id.*; *see also Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321 (Fed. Cir. 1994) (listing, as examples of circumstantial evidence, advertising, sales figures, and intentional copying by competitors). In particular, the Court of Appeals for the Federal Circuit, our primary reviewing court, recently collected into a set of factors the kinds of

evidence and inquiries to be considered in assessing whether a mark has acquired

distinctiveness, stating as follows:

> Today we clarify that the considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the trade dress with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark.

*Converse, Inc.*, 128 USPQ2d at 1546.[8]

In support of its claim of acquired distinctiveness, Applicant submitted the

declaration of Ronald R. Sciortino, Applicant's President.[9] Mr. Sciortino declares,

among other things, the following:

> The claimed trade dress subject to the above-referenced application is a fully-equipped trailer concession stand for snowball vendors including a snow-capped roof with the word "SnoBalls," a snowball and associated beverage container positioned thereon.

---

[8] While *Converse* concerned an appeal from a decision issued by the International Trade Commission, the Federal Circuit's clarification of the factors in determining acquired distinctiveness is equally applicable to any Board proceeding that necessitates a showing of secondary meaning, and not only those cases which concern the registrability of a product design mark. Thus, it is different than a Federal Circuit decision applying regional circuit trademark law, which may or may not be the same as Federal Circuit precedent. Moreover, while the first *Converse* factor appears limited to the association of an asserted trade dress with a particular source by actual purchasers, we assume this factor is likewise applicable to the association of any asserted designation as an indicator of source by relevant consumers of the goods or services at issue. Furthermore, although the *Converse* decision was issued after the briefing of this ex parte appeal was completed, the clarification of the Section 2(f) factors enunciated by the Federal Circuit does not alter our analysis in any significant way, require any additional briefing by Applicant or the Examining Attorney, or affect the ultimate resolution of this ex parte proceeding. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1729 (Fed. Cir. 2012); *In re Steelbuilding.com*, 75 USPQ2d at1424.

[9] September 18, 2017 Response to Office Action; TSDR pp. 7-8.

> Applicant sells the fully equipped trailer to snoball vendors as a convenient means to quickly establish a fully operational snoball business.
>
> Applicant has sold the concession trailer subject to the above-referenced application since at least February 19, 2009.
>
> Total yearly sales from 2009-present of the claimed trade dress concession trailer average approximately $35,000 per year.

Additionally, by way of his declaration, Mr. Sciortino introduces a screenshot from

Applicant's website, the relevant portion of which is reproduced below:[10]

---

[10] *Id*. at TSDR p. 9. In its September 18, 2017 Response to Office Action, Applicant claimed ownership of a prior registration issued on the Supplemental Register for matter identical to the one at issue in this appeal. *Id*. at TSDR p. 5. Applicant, however, did not make this registration of record prior to appeal; instead, Applicant submitted a copy of its claimed prior registration with its appeal brief. The record in an application should be complete prior to the filing of an appeal. *See* Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d). Because the submission of the copy of the prior registration is untimely and the Examining Attorney has objected to its submission on this ground, we have given it no consideration in our analysis. In any event, a party may not base a claim of acquired distinctiveness under Section 2(f) of the Trademark Act on ownership of a registration issued on the Supplemental Register. *See* Trademark Rule 2.41(a)(1), 37 C.F.R. § 2.41(a)(1); *see also In re Canron, Inc.*, 219 USPQ 820, 822 n.2 (TTAB 1983) and TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 1212.04(d) (October 2018) (claims of acquired distinctiveness under §2(f) may not be based on ownership of registrations on the Supplemental Register).



Having carefully reviewed the evidence of record, including the specimen of record, we agree with the Examining Attorney that Applicant has failed to establish acquired distinctiveness of its proposed mark within the meaning of Section 2(f) of the Trademark Act. In this case, Applicant has sold its identified goods for nine years, and Applicant has provided dollar figures of the sales of its concession trailers, namely, approximately $35,000 per year since 2009. We cannot glean any meaningful information from these sales figures since Applicant failed to submit any evidence regarding the cost of each of its concession trailers, how many consumers have purchased Applicant's concession trailers, or how many trailers it sold per year. Indeed, one could reasonably assume that the sales average is modest for large items such as concession trailers. Nonetheless, even if we assume the sales to be more than

modest, "mere figures demonstrating successful product sales are not probative of purchaser recognition of a configuration as an indication of source." *Stuart Spector,* 94 USPQ2d at 1572 (citing *Braun Inc. v. Dynamics Corp.*, 975 F.2d 815, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992)); *see also In re Bongrain Int'l (Am.) Corp.*, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may be indicative of popularity of product itself rather than recognition of the asserted mark as denoting origin). Moreover, Applicant's alleged length of use of its asserted mark, extending over nine years, is simply insufficient, in itself, to bestow acquired distinctiveness. We are unable to conclude that consumers have come to recognize Applicant's asserted mark as an indication of source based upon this length of use. *See, e.g., In re Van Valkenburgh,* 97 USPQ2d 1757, 1766 (TTAB 2011) (sixteen years' use of motorcycle stand insufficient); *In re Howard Leight Ind. LLC*, 80 USPQ2d 1507, 1517 (TTAB 2006) (fifteen years' use of earplug configuration insufficient); *Ennco Display Sys.*, 56 USPQ2d at 1286 (seven to seventeen years' use for eyeglass/spectacle frame display holders insufficient).

As noted above, the critical inquiry is whether the applied-for product design is used and advertised in the marketplace in a manner that educates consumers to recognize the product design as serving to distinguish the source of such products from the goods of others. *See Stuart Spector,* 94 USPQ2d at 1572 ("To determine whether a configuration has acquired distinctiveness, advertisements must show promotion of the configuration as a trademark."). Sample advertisements showing "look-for" types of promotional efforts from an applicant may be particularly

probative on the issue of whether a product design functions as a source identifier. "'Look for' advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. It does not refer to advertising that simply includes a picture of the product or touts a feature in a non source-identifying manner." *Id*.

Here, the record is devoid of "look for" advertising. *Cf. In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 423-24 (Fed. Cir. 1985) (describing effective "look for" advertising). The only advertisement Applicant submitted for its identified goods is a screenshot from its website. The screenshot shows a number of different trailers, only some of which contain the elements depicted in the drawing of the applied-for mark, and fewer of which contain all the elements depicted in the drawing of the asserted mark. Furthermore, there is nothing from the provided screen capture to show that Applicant is advertising the applied-for product design to educate the relevant consumers that the applied-for mark acts as an indicator of source for the goods identified in the application. Accordingly, this evidence does not demonstrate that prospective purchasers of Applicant's concession trailers view the snow-capped roof and attendant features as an indication of their source.

Applicant has also not provided any of the other kinds of evidence that may show that the mark has acquired distinctiveness, namely: (1) advertising figures for its goods, (2) the number of customers for its goods, (3) evidence regarding its exclusivity of use, (4) the unit amount of concession trailers it has sold, (5) evidence demonstrating an association of Applicant's applied-for product design or trade dress

with Applicant by actual purchasers, (6) evidence showing that others have intentionally copied Applicant's product design, or (7) unsolicited media coverage of its concession trailer product design. *See, e.g., Converse, Inc.*, 128 USPQ2d at 1546; *Coach Servs., Inc.*, 101 USPQ2d at 1729; *In re Steelbuilding.com*, 75 USPQ2d at 1424.[11]

We now turn to the evidence the Examining Attorney submitted to demonstrate that concession trailers with decorative roofs consisting of representations of ice, snow cones, and similar food item designs are not uncommon. A representative sample is displayed below:


[12]

---

[11] As noted supra, n.7, we have also considered the impact of the term SNOBALLS as part of Applicant's asserted composite mark, but this does not help Applicant. As previously noted, the term is at best highly descriptive of the identified goods, and the screenshot from Applicant's website suggests that the term is part of the "standard graphics" supplied to snowball vendors in order to alert consumers that the trailer sells snowballs, not that Applicant is the source of the concession trailer.

[12] March 17, 2017 Office Action (from the website www.roadarch.com); TSDR p. 11.





---

13 October 19, 2017 Office Action (from the Facebook page of The Snowball Stand); TSDR p. 16.

14 *Id.* (from the website www.riverfronttimes.com); TSDR p. 25.





---

[15] *Id*. (from the Yelp page of Ro-Bear's Snowballs & Soft Serve); TSDR p. 29.

[16] *Id*. (from the website www.gainesvilleregister.com); TSDR p. 39.



17



18

Keeping in mind that the above-noted concession stands and concession trailers

are used to identify frozen refreshment product retail outlets and signal the kind of

---

[17] *Id.* (from the website www.everdaybest.com/texas-food-truck-festival/); TSDR p. 61.

[18] *Id.* (from the website www.gainesvilleregister.com/news/local news/snoball-stand-opens-for-another-season/article); TSDR p. 67.

refreshments offered for sale at such retail outlets, there is no indication that these various product designs are perceived by consumers as indicators of source for any goods or services, let alone for the trailers themselves. Moreover, while these third-party uses of concession trailer designs may not be substantially similar to Applicant's applied-for mark, this evidence nonetheless shows that consumers are accustomed to seeing decorative roofs with snow cones, ice cream and similar food item designs on concession trailers and the like, presented in a non-source-indicating manner. Under such circumstances, consumers for concession trailers would look to differently designed concession trailer roofs as being aesthetic features, or generally advertising food items sold within, rather than acting as an indicator of source. *See Wal-Mart Stores,* 54 USPQ2d at 1066; *cf. Converse, Inc.,* 128 USPQ2d at 1547 (in considering exclusivity of use factor in determining acquired distinctiveness, third-party uses not "substantially similar" to the asserted mark will not preclude a finding of secondary meaning).

In conclusion, and after weighing all of the factors for which there is evidence in determining whether Applicant's asserted mark has acquired distinctiveness, we find that Applicant has not established that its non-inherently distinctive product design (or trade dress) that is the subject of its application has acquired distinctiveness as a source identifier in connection with Applicant's snowball concession trailers.

**Decision**: The refusal to register under Sections 1, 2 and 45 of the Trademark Act on the ground that Applicant's proposed mark is a non-distinctive product design and

that Applicant has not established acquired distinctiveness under Section 2(f) of the

Trademark Act is affirmed.